Ben-Hur Manufacturing Company, Plaintiff and Respondent, v. Firemen's Insurance Company of New Jersey, Defendant and Respondent: American Church & Home Mutual Insurance Company, Defendant and Appellant.

*November 1—November 27, 1962.*

260

For the appellant there were briefs by *Willink & Thompson* of Madison, and oral argument by *Donald D. Willink.*

For the respondent Ben-Hur Manufacturing Company there was a brief by *Quarles, Herriott & Clemons,* and oral argument by *L. C. Hammond, Jr.,* all of Milwaukee.

For the respondent Firemen's Insurance Company of New Jersey there was a brief by *Whyte, Hirschboeck, Minahan, Harding & Harland* of Milwaukee, attorneys, and *Clausen,*

*Hirsh, Miller & Gorman* of Chicago, Illinois, of counsel, and oral argument by *Reginald W. Nelson* of Milwaukee.

HALLOWS, J.   The initial question is whether either Ben-Hur or Midwest, or both, had an insurable interest in the property.  Public policy requires an insurable interest in property insured.  A gambling or wagering agreement is void, sec. 331.055, Stats.; but that section provides a contract of insurance made in good faith for the security or indemnity of the party insured shall be lawful and valid.  A fire insurance policy is an agreement to indemnify one for a loss caused by the specific peril insured against; but to constitute a loss for which indemnity can be made, one must have in the property an interest which is recognized as insurable.  Such interest must consist of such valuable relationships as the law will recognize and enforce and must be susceptible of pecuniary value.  Vance, Insurance (2d ed.), p. 118, sec. 48.  A person has an insurable interest in property when the relationship between him and the property is such that he has a reasonable expectation, based upon a real or legal right, of benefit to be derived from the continued existence of the property and of loss or liability from its destruction.  *Riggs v. Commercial Mut. Ins. Co.* (1890), 125 N. Y. 7, 25 N. E. 1058; 3 Couch, Insurance (2d ed.), p. 86, sec. 24:13.

This court defined the nature of insurable interest in somewhat-broader terms.  A person need not have an absolute insurable right of property in the thing insured or even a special limited interest.  It is sufficient if a person's relationship to the property is such he would reasonably be expected to suffer a loss by the destruction of the property or to derive a benefit from its continued existence.  Neither a legal nor an equitable interest nor any property interest as such in the subject matter is necessary.  *Horsch v. Dwelling House Ins. Co.* (1890), 77 Wis. 4, 45 N. W. 945; *Tischendorf v. Lynn*

*Mut. Fire Ins. Co.* (1926), 190 Wis. 33, 38, 208 N. W. 917. See also 29 Am. Jur., Insurance, p. 781, sec. 438.

The appellant contends Ben-Hur had no insurable interest at the time of the fire because it had sold the property to Midwest and was an unsecured creditor. Firemen's contends Ben-Hur had title, custody, and possession of the goods and Midwest had no insurable interest. There is no distributor's contract as such in evidence defining the relationship of Ben-Hur and Midwest, nor is the relationship spelled out very clearly from their transactions and documents. The fact both Ben-Hur and Midwest took out insurance is immaterial on the question of the existence of an insurable interest. The existence of an insurance policy does not prove an insurable interest.

The pertinent facts are that in 1955 Midwest, a wholesale dealer in electrical appliances, became a distributor of Ben-Hur products and Ben-Hur and Midwest entered into a warehouse contract (Lawrence agreement). Goods were shipped by Ben-Hur to Midwest in care of the Lawrence Warehouse Company and held under the agreement. The goods remained in the warehouse until sold by Midwest to retail dealers. The transaction appeared on the books of both companies as a sale at the time the goods were shipped. The Lawrence agreement provided Ben-Hur should have a pledgee's interest in the goods shipped to be represented by nonnegotiable warehouse receipts. The agreement stated Ben-Hur was unwilling to sell to Midwest except on the basis it was guaranteed and secured with respect to the purchase price of the goods. Delivery instructions were agreed upon whereby Lawrence was authorized to deliver to Midwest goods up to a value of $5,000 and to report such delivery weekly to Ben-Hur. Each report was accompanied by a check from Midwest for the amount of the goods so withdrawn. Later the amount was increased to $12,000.

While the Lawrence agreement was in effect, the goods manufactured by Ben-Hur were kept separate in a wire fence enclosure under lock and key from the other goods in the warehouse. Clyde Wicks, an employee of Midwest, was designated an agent of Lawrence and put on its payroll but his salary, plus a service fee, was paid to Lawrence by Midwest. Wicks, besides his duties in reference to the goods manufactured by Ben-Hur, continued to perform warehousing services for Midwest. Ben-Hur exercised no control over the price and terms of the sales by Midwest nor was any accounting of such sales required.

Under this arrangement, the appellant contends the sale was made by Ben-Hur to Midwest with a pledge back. Firemen's argues Midwest acquired no rights in the goods until it removed them from the warehouse upon actual sale. The Lawrence agreement was terminated at the request of Midwest in May of 1957 in order to avoid the expense of warehousing. Thereafter Wicks went back on Midwest's payroll. The goods were stored in the same location in the warehouse but not under lock and key and Midwest remitted for the goods removed as it did under the Lawrence agreement. A dishonesty bond was given to Ben-Hur insuring it against the acts of the president of Midwest who was designated a sales agent of Ben-Hur and the bond referred to the transaction as a consignor-consignee relationship. The invoices for the goods did not refer to Lawrence but provided "wkly, whse, withdral." Warehouse receipts were no longer given. The removal of the goods and method of payment remained the same. No liability for payment of the goods by Midwest arose until the goods were removed from the warehouse although the invoices were sent to Midwest at the time the goods were shipped.

The appellant contends after the termination of the Lawrence agreement Ben-Hur became simply an unsecured creditor. We do not agree. While it may be difficult or well-

nigh impossible to categorize the relationship of the parties, it does not follow that Ben-Hur had no insurable interest. The accounting procedure, while indicating an open-account sale at the time of shipment, did not reflect the true relationship between the parties. However inaptly and inconsistently the relationship was spelled out, it is clear Ben-Hur was not an unsecured creditor on open account. We find no liability on Midwest to pay for the goods in all events. The limitations on possession or custody by Midwest and the bond cannot be overlooked. True, the bond did not necessarily establish a consignor-consignee relationship but its intent was to provide some security for what Ben-Hur regarded as an interest in the goods and without which Ben-Hur would not sell to Midwest. The parties regarded the president of Midwest as personally responsible should Midwest remove goods from the warehouse without paying for them. The arrangement might be said to be somewhat analogous to a bailment for sale. But whatever label we put on the relationship, Ben-Hur had an interest in the existence of the property and a reasonable expectation of loss by its destruction. Title, possession, or special lien is not necessary to support an insurable interest.

Likewise Midwest had an insurable interest. Assuming Ben-Hur had title as contended by Firemen's, Midwest at least had possession with a right to sell the property for profit. True, there may have been limitations on the time of payment and on the amount of goods that could be withdrawn without paying therefor, nevertheless Midwest had control of the goods and the right to sell them. The dishonesty bond given by the president of Midwest, although designating him as a sales agent of Ben-Hur, recognized possession in Midwest for which the president agreed to be responsible. The arrangement on warehousing of the goods in St. Louis was of a mutual benefit to both parties. While we cannot recommend this arrangement for its clarity or as

a sure means of obtaining all the objects the parties had in mind, it does result at least in establishing an insurable interest in both Ben-Hur and Midwest sufficient to sustain the validity of their respective fire insurance policies. This does not mean, of course, that both could have collected the full damage to the goods nor are they attempting to do so. After the fire, Midwest assigned its cause of action to Ben-Hur. There can be but one recovery. The assignment had no effect on the question of insurable interest. The trial court's finding was not against the great weight and preponderance of the evidence and must be affirmed.

The next question is the liability of American Church and Firemen's under their respective policies. Both agree this question is governed by the pro rata clause contained in the printed part of the policies. Both argue the multiple-location reporting Form A endorsement provides permission for other insurance and by the terms of this form we are necessarily drawn to the pro rata clause. We have some difficulty with this argument because it would seem such form contemplates permission granted to the insured named in the policy, but here the other insurance was not taken out by that insured. This is an unusual case in that Ben-Hur and Midwest each insured itself in respect to the same property in different companies. The broad language of the pro rata clause independently of the reporting form would cover these facts as it does insurance issued to the same insured covering the same property against the same peril involved.

Before construing the pro rata clause, it is necessary to examine the nature and purpose of the multiple-location reporting form. This form of policy, its purpose, and the benefits to a policyholder have been uniformly recognized by the courts. In *Federal Intermediate Credit Bank v. Globe & Rutgers Fire Ins. Co.* (D. C. Md. 1934), 7 Fed. Supp. 56, 58, it is stated:

"Monthly reporting insurance is a device whereby the amount of insurance effective under the policy varies from time to time and does not exceed at any time the value of the property insured. As the amount of premium to be paid for the insurance is in direct proportion to the amount of the insurance granted by the policy, it is obvious that this form of insurance is more favorable to the insured than a policy for a specified amount of insurance where the premium is calculated and has to be paid on the amount specified in the policy although the value at risk may be materially less from time to time than the amount specified in the policy."

The purpose of this type of policy was characterized:

"The policy involved in this case was intended to offer to the owners of fluctuating businesses the opportunity of full insurance coverage while at the same time exacting from the insured only the amount of premiums figured on the average monthly amount of reported inventory." *Camilla Feed Mills v. St. Paul Fire & Marine Ins. Co.* (5th cir. 1949), 177 Fed. (2d) 746, 747, 13 A. L. R. (2d) 705.

In *Peters v. Great American Ins. Co.* (4th Cir. 1949), 177 Fed. (2d) 773, 774, the purpose was described as follows:

"Monthly reporting insurance is a device whereby the amount of insurance under the policy fluctuates with the value of the changing stock of merchandise in a going business. It is designed to afford complete coverage and at the same time to avoid the maintenance of insurance in excess of the value of the property insured, so that the amount of insurance, and the amount of the premium to be paid, are in direct proportion to the value of the goods on hand."

The latter two cases are referred to by this court in *Albert v. Home Fire & Marine Ins. Co.* (1957), 275 Wis. 280, 81 N. W. (2d) 549, wherein the reporting form policy was held to be valid. In *Commonwealth Ins. Co. of N. Y. v. O. Henry Tent & Awning Co.* (7th Cir. 1961), 287 Fed. (2d) 316, 319, the court stated:

"The device of monthly reporting serves the purpose of affording complete insurance coverage on a fluctuating stock of merchandise and of determining a premium directly proportionate to the risk declared by the insured."

See also *Michigan Millers Mut. Fire Ins. Co. v. Grange Oil Co.* (9th Cir. 1949), 175 Fed. (2d) 540; *Gillies v. Michigan Millers Mut. Fire Ins. Co.* (1950), 98 Cal. App. (2d) 743, 221 Pac. (2d) 272; Anno. Provisional or Monthly Reporting Insurance, 13 A. L. R. (2d) 713.

Monthly reporting form insurance, covering either single or multiple locations, is sometimes also called provisional or fluctuating insurance and consists of an endorsement attached to a basic policy insuring against a variety of risks such as fire, tornado, water, and windstorm. A merchant or a manufacturer having an inventory of stock on hand, the value, character, or location of which varies considerably during the period of a year, is confronted with the problem of securing some type of indemnity contract which will protect him while his stock of goods is constantly changing and when no part of the property which might be destroyed or damaged may have been at the location at the time when the insurance was written. He needs insurance covering property of a class and which he may have on hand at the locations described at the time of the loss. If the merchant took out a specific or nonreporting policy, he could secure adequate coverage only by carrying insurance in the maximum amount of his fluctuating stock at each location and paying a premium for that amount of insurance even though during the greater part of the year he would be overinsured. True, some premium relief could be secured by the use of a coinsurance clause but the necessity would still exist of carrying a high amount of insurance throughout the year when only such amount would be needed for a short part of the year. The reporting form or provisional policy provides insurance for the insured within its maximum limit for the cash value of

goods on hand at any time and requires a premium to be paid only on the average value of goods at risk during the policy year. By determining the premium in direct proportion to the value of the fluctuating goods, the insured does not pay for insurance he does not need and if he complies with the terms of the policy, he has coverage within the limit of the policy when he needs it. Thus the amount of insurance varies with the value of the goods insured and the premium is calculated accordingly.

In practice, a reporting form policy may also be used in combination with a specific or nonprovisional policy in which case the policy provides the specific insurance must be exhausted in payment of the loss first and the reporting form will pay the excess. This is necessarily so because in such a case the premium of the reporting form policy is based only upon the average value of goods which exceeds the amount of specific insurance. Likewise, two or more reporting form policies may be used together applying to one or more locations. When two or more reporting form policies exist on the same goods and written for the same insured, the policies provide that each policy will bear an agreed percentage of the total of such contributing insurance and the premium is divided between the various policies by the same percentage of liability assumed.

The multiple location reporting Form A monthly average with premium adjustment used by American Church and Firemen's provides for a provisional amount of insurance and for a deposit premium of 75 percent of such provisional amount. This provisional amount is the maximum amount of liability of the company under any working of the policy. When there is no specific insurance or other multiple reporting form policy, and if the insured intends complete coverage of his fluctuating property, this provisional amount should be equal to or in excess of the highest value of the goods which the insured would expect to have on hand at any time during the term of the policy. If it turns out that such limit

is insufficient, there is provision for increasing the limit by written endorsement and paying an additional provisional premium.

The provisional premium is adjusted at the end of the term of the policy and an actual premium determined on the basis of the average total values reported at each location or if specific insurance also exists on such average after deducting the amount of specific insurance. In operation, the provisional policy requires the assured to report not later than thirty days after the last day of each calendar month the total actual cash value of the property at each location and all specific insurance, if any. If the insured makes correct reports, the amount of insurance within the maximum limits of the policy for that location will equal the actual cash value of the property at the time of the loss even though the value of property exceeds the amount reported for that location in the last report of values. If the insured has failed to report in any month the values of the goods on hand, the policy covers only for the locations and for not more than the values included in the last report of values filed prior to the loss. Under the full-reporting clause, the liability under the policy in no case exceeds that proportion of any loss, after deducting for any specific insurance which the last-reported value filed prior to the loss bears to the total actual cash value on the date for which the report is made. When incorrect or dishonest reports are filed and full values are not reported, the effect of the full-reporting clause is to make the insured a coinsurer. *Albert v. Home Fire & Marine Ins. Co., supra.*

Considering provisional reporting policies in the light of the pro rata clause is not free from difficulty. The pro rata clause of a fire policy (also set forth in sec. 203.01, Stats., lines 86–89) provides:

"PRO RATA LIABILITY. This company shall not be liable for a greater proportion of any loss than the amount hereby

insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not."

In construing this clause in reference to several specific policies, one of which contained an 80 percent coinsurance clause, this court stated in *Stephenson v. Agricultural Ins. Co.* (1903), 116 Wis. 277, 93 N. W. 19, the amount of insurance effected by a specific policy was a maximum amount of risk assumed or the face of the policy, the amount of loss was the adjusted amount of damage to the property, and the amount of liability was the amount of damage properly apportioned to each specific policy. In that case it was held the 80 percent coinsurance clause should not be given effect in determining the amount of the whole insurance upon the risk.

Appellant strongly argues the provisional amount of $100,000 of the Firemen's policy must be the amount hereby insured by analogy to specific insurance, relying on *American Lumbermens Mut. Casualty Co. v. Lumber Mut. Casualty Ins. Co.* (1937), 251 App. Div. 231, 295 N. Y. Supp. 321, *Farmers' Feed Co. v. Scottish Union & Nat. Ins. Co.* (1903), 173 N. Y. 241, 65 N. E. 1105, and *Stephenson v. Agricultural Ins. Co., supra.* Under the appellant's theory, since Firemen's policy also included property other than that manufactured by Ben-Hur, it might be considered a blanket policy with the possibility of either the "Page" rule or the "Cromie" rule being applied. The majority of cases, when an apportionment between specific and blanket policies is appropriate, have applied the Cromie rule.[1] However the appellant urges upon this court the

[1] *Meigs v. London Assur. Co.* (Cir. Ct. Pa. 1904), 126 Fed. 781; *Pearl Assur. Co. v. Hartford Fire Ins. Co.* (1940), 239 Ala. 515, 195 So. 747; *Cromie v. Kentucky & Louisville Mut. Ins. Co.* (1854), 54 Ky. (15 B. Monroe) 432; *Angelrodt v. Delaware Mut. Ins. Co.* (1862), 31 Mo. 593; *Liverpool & London & Globe Ins. Co. v. Delta County Farmers' Asso.* (1909), 56 Tex. Civ. App. 588, 121 S. W. 599.

doctrine of the "full-risk theory" set forth by the author of the annotation in 169 A. L. R. 387, which has not yet received support of any of the courts. We do not believe the analogy to specific and blanket policies is valid when dealing with proration between reporting form policies. The purpose and functioning of the several types of policies are entirely different.

The language "amount hereby insured" in the pro rata clause must be determined in reference to the particular policies involved and from a consideration of their purpose. It is contended by the appellant the provisional amount of insurance in the reporting policies should be taken as the amount insured. We do not agree. The "amount hereby insured" as used in the pro rata clause assumes the amount of insurance on which premiums are paid. The provisional amount in the reporting form is not the amount of insurance for which premiums are paid but merely an amount tentatively taken to determine an advance premium and to constitute a maximum limit of liability. The reporting form policy expressly insures the actual cash value of the stock of goods as it fluctuates from time to time and as it may exist at the time of the fire within the maximum provisional limit of the policy. In a specific policy the amount of insurance is constant; in a reporting form it varies from time to time. The date of the loss is the important date in determining the amount of insurance in existence. At the time of the fire the "amount hereby insured" under the Firemen's policy was the cash value of the property damaged or $21,845.57.

In applying the pro rata clause to provisional or reporting policies, the amount hereby insured must mean the amount of insurance afforded by the policy on the day of the fire which would be the cash value of the goods damaged but not exceeding provisional limit of the policy. An unusual difficulty exists in determining the "amount hereby insured" under the American Church's policy. For reasons not ex-

plained in the record, the agent each month attached a conversion endorsement to the policy changing the maximum limit to the amount of the cash value of the goods reported for the previous month. The premium on this policy was not written on the provisional amount of insurance but on the reported value of the goods and adjusted monthly. By so endorsing the policy each month and reducing what would be a provisional limit to a maximum limit and the amount of insurance for one month, the insured did not receive the benefit of a multiple reporting form. The last report before the fire was made on September 14, 1958, and reported values of $15,690 as of the end of August. The limit of the policy was endorsed at this amount. If we were to give strict effect to this endorsement, Ben-Hur did not receive insurance on any increase in value of goods over the last-reported amount until a new endorsement was put on the policy. This method of handling the reporting form defeated its very purpose and the total amount of premium received by the appellant for the term of the policy exceeded the amount of insurance afforded.

The appellant insists that such procedure is legal. We think it violates sec. 203.22, Stats., which provides no insurance company shall issue any policy containing any provision limiting the amount to be paid in case of loss below the actual cash value of the property if within the amount for which the premium is paid. In addition, if the endorsements were not void, the argument carried to its logical conclusion would require us to treat the policy not as a reporting form policy but as specific insurance, and the Firemen's policy as excess insurance.

We believe it is more just and equitable, since both insurers received premiums on the basis of extending full coverage, to treat the American Church's policy as a reporting form and disregard the highly unusual method of computing its premiums and attempting to limit its liability.

Since the value of the goods damaged is less than the original provisional amount of $25,000 stated in the policy, the "amount hereby insured" by the policy must be taken for the purpose of this suit as $21,845.57. Since each policy insured the full value of the goods and no more, its proportion of insurance to the whole insurance covering such property under the pro rata liability clause was one half. American Church and Firemen's should, therefore, each pay one half of the net loss of $18,010.20, or $9,005.10. This is the conclusion the trial court correctly came to and it must be affirmed.

*By the Court.*—Judgment affirmed.