REBECCA G. BRADLEY, J.
¶ 85. (concurring in part, dissenting in part). I agree that interpretation of the insurance policies at issue presents a question of law for this court to decide; therefore, I join Part III of the majority opinion. I respectfully dissent from Part IV of the majority opinion because the homeowner's policy in effect on the date of the loss constituted "permanent property insurance that applies" as that phrase is unambiguously used in the builder's risk policy. Therefore, coverage under the builder's risk policy ended when the homeowner's policy took effect.
¶ 86. This case involves two separate insurance policies: (1) a builder's risk policy issued by Assurance Company of America to Fontana Builders, Inc. and (2) a homeowner's policy issued by Chubb Insurance Company to James and Suzy Accola. As the majority explains, interpretation of insurance policies *538 presents a question of law for the court to decide. Majority op., ¶ 38. The majority also correctly explains that "whether the [builder's risk] policy provides an initial grant of coverage turns upon whether 'permanent property insurance applie[d]' so as to terminate coverage." Id,., f 51. To answer this question, I focus on the terms of the policies, interpret them as a reasonable person in the position of the insured would, and resolve any ambiguities in favor of coverage for the; insured. See Burgraff v. Menard, Inc., 2016 WI 11, ¶¶ 21-22, 367 Wis. 2d 50, 875 N.W.2d 596.
¶ 87. The builder's risk policy in effect at the time of loss took effect on April 19, 2007, although construction of the home began in 2005 and Assurance issued an earlier insurance policy that year. Although the new policy listed a one-year effective period, Section E.3 provides additional conditions governing both the beginning and the end of coverage. At issue is Section E.3.f. in the builder's risk policy, which provides:
E. Additional Conditions
The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:
3. When Coverage Begins and Ends
We will cover risk of loss from the time when you are legally responsible for the Covered Property on or after the effective date of this policy if all other conditions are met. Coverage will end at the earliest of the following:
*539 F. When permanent property insurance applies ...
(second and third emphasis added). As the majority indicates, the builder's risk policy does not define "permanent property insurance" nor does it define "applies." Majority op., ¶ 52. This is not problematic, however, because the meaning of the phrase "when permanent property insurance applies" is unambiguous.
¶ 88. The first question is whether homeowner's insurance may be considered "permanent property insurance" under the builder's risk policy. A reasonable person purchasing insurance would understand that a homeowner's insurance policy constitutes "permanent property insurance." It is unnecessary to specifically define the boundaries of "permanent property insurance" because homeowner's insurance reasonably falls within those boundaries.
¶ 89. The second question is the meaning of "applies" as that word is used in section E.3.f. of the builder's risk policy. The majority opinion questions the clarity of "applies," majority op., ¶ 54, and ultimately concludes that "[t]he Chubb [homeowner's] policy in no way covered Fontana's interest as a builder and owner; therefore, it did not 'apply' so as to supersede the builder's risk coverage." Majority op., ¶ 64. I disagree. The meaning of "applies" is not ambiguous and does not depend upon an analysis of Fontana's interests.
¶ 90. Section E.3. governs the beginning and end of coverage under the builder's risk policy for the "Covered Property." It logically follows that the word "applies" within the phrase "[w]hen permanent property insurance applies" refers to the application of "permanent property insurance" to the property cov *540 ered by the policy. The builder's risk policy lists the location of the property: 1527 Muirfield Court in Lake Geneva, Wisconsin. It also defines "Covered Property," in pertinent part, as:
Property which has been installed, or is to be installed in any commercial structure and/or any single family dwelling, private garage, or other structures that will be used to service the single family dwelling at the location which you have reported to us. This includes:
(1) Your property;
Under this definition, a reasonable insured would understand that the covered property is the home located at 1527 Muirfield Court.
¶ 91. The majority concludes that the meaning of "applies" in the phrase "[w]hen permanent property insurance applies" is ambiguous because it could be interpreted to mean: (1) permanent property insurance acquired by the builder after completion of the structure or (2) permanent property insurance acquired by any third party, such as a prospective buyer, to cover the property. See majority op., ¶ 55. Merely because "permanent property insurance" could be procured by more than one type of insured does not render "applies" a term without an ascertainable meaning. The insurance policy does not condition the end of coverage on the insured (here, the builder) obtaining the permanent property insurance. Instead, permanent property insurance could be obtained by the builder at the completion of construction or by another interested party, such as the owner or prospective owner. Under the unambiguous language of the builder's risk policy, the procurement of permanent property insurance *541 covering the property ends coverage under the builder's risk policy. The condition in the builder's risk policy ends coverage "when other permanent property insurance applies" — regardless of whether it is the insured under the builder's risk policy that obtains the permanent property insurance.
¶ 92. The final question is whether the homeowner's policy (the permanent property insurance) applied to the home (the covered property) at the time of the loss. The answer is yes. The homeowner's policy insured the home located at 1527 Muirfield Court in Lake Geneva, Wisconsin, which is the same home insured under the builder's risk policy. As a result, coverage under the builder's risk policy ended when the homeowner's insurance took effect on June 21, 2007, prior to the loss.
f 93. This interpretation is not only consistent with how a reasonable insured would read the builder's risk policy language, but also comports with the purpose of builder's risk insurance. "A builders risk policy typically covers a structure under construction; materials, fixtures, supplies, machinery, and equipment to be used in the construction . ..." 5 Jeffrey E. Thomas & Susan Randall, New Appleman on Insurance Law Library Edition § 50.01(1)(a) (2015). This is exactly how Barbara R. Holden, the supervisor of builder's risk insurance underwriting at Assurance, explained Assurance builder's risk policies during her deposition in this case. She testified that builder's risk insurance covers "structures under construction, renovations, or additions" along with "materials that will be installed by the builder." Furthermore, a builder's risk policy is a temporary form of insurance that "ends once the construction is considered completed, as defined in the policy. It is then up to the owner to obtain *542 permanent property insurance on the newly constructed property." Id. Builder's risk "coverage generally extends until the placement of permanent property insurance to cover the completed work." 4 Douglas L. Patin, Law and Prac. of Ins. Coverage Litig. § 45:25 (2015).
¶ 94. That is precisely what happened here. Assurance issued the builder's risk policy to Fontana Builders and AnchorBank on April 19, 2007. That policy terminated when the prospective owners, the Accolas, obtained permanent property insurance on June 21, 2007 in the form of a homeowner's policy from Chubb Insurance Company. Although the Accolas had not yet closed on the home prior to the loss, construction was essentially completed as evidenced by the fact that the Accolas were living in the home and had moved over $500,000 worth of personal property into the home. These actions, along with the fact that they paid nearly $5,000 to obtain the homeowner's policy, indicate that the Accolas had every intention of completing the purchase of the home.
¶ 95. Notably, as the majority opinion acknowledges, because a significant percentage of the home's construction was already completed at the time Fon-tana applied for a new builder's risk policy, Assurance would have declined to issue another builder's risk policy to Fontana, but for Assurance's data entry error during the underwriting process. See majority op., ¶ 11 n.5. A builder's risk policy is designed to cover a structure under construction. It is not intended to insure a home occupied by a family and $500,000 worth of that family's personal property.
¶ 96. The majority opinion raises the specter of "substantial mischief' in the construction industry if prospective purchasers could terminate a builder's risk *543 policy. Majority op., ¶ 66. The majority opinion, however, ignores the fact that an insurance policy is a contract and a builder may negotiate and pay premiums for the risks the builder wishes to insure. In this case, Fontana purchased a policy containing a number of conditions under which coverage would end, including not only "[w]hen permanent property insurance applies" but also "[n]inety days after initial occupancy of the Covered Property" among others. To hold, as the majority does, that Fontana purchased a policy intending to maintain coverage overlapping with coverage obtained by the family occupying the home rewrites the Assurance policy and confers a benefit on Fontana for which it did not bargain.
¶ 97. The majority opinion acknowledges that James Accola was the president and sole shareholder of Fontana,[1] yet repeatedly insists Fontana had a reasonable expectation that coverage would persist under the builder's risk policy,[2] despite the Accolas' procurement of the homeowner's policy concomitantly with their occupancy of the home. The fact that the Accolas obtained coverage for the home under a homeowner's policy suggests exactly the opposite reasonable expectation on the part of Fontana — that the homeowner's policy would supplant the builder's risk policy because construction was substantially complete to the extent that the Accolas and over $500,000 of their property could occupy the home. These unique facts belie any purported frustration of Fontana's reasonable expectations. That the homeowner's policy would succeed and not overlap with the builder's risk policy is indeed the only reasonable expectation Fontana could *544 have had, unless it (or the Accolas) intended a different sort of "substantial mischief."
¶ 98. The majority's conclusion results in a "remand to the circuit court for a determination of Fon-tana and AnchorBank's remaining damages." Majority op., ¶ 69. This instruction could be read as an invitation to disregard the principle that "[t]here can be but one recovery" with respect to a loss. See Ben-Hur Mfg. Co. v. Firemen's Ins. Co. of N.J., 18 Wis. 2d 259, 266, 118 N.W.2d 159 (1962). Stated differently, the majority's opinion could be read as allowing two recoveries for the same loss — namely damage to the home on Muirfield Court. This is precisely what our decision in Ben-Hur prohibited. Id.
¶ 99. In Ben-Hur, a fire damaged property manufactured by Ben-Hur Manufacturing Company that it housed in its distributor's warehouse. Id. at 260. Ben-Hur had a policy with American Church & Home Mutual Insurance Company while Firemen's Insurance Company of New Jersey insured the distributor. Id. The question arose as to whether one or both policies covered the fire loss. The answer turned on whether Ben-Hur, the distributor, or both parties had an insurable interest in the damaged property. Id. at 263, 265-66. We held that both Ben-Hur and the distributor had different insurable interests in the damaged property. Id. at 265. Despite each party having its own insurable interest in the same property, we explained: "This does not mean, of course, that both could have collected the full damage to the goods nor are they attempting to do so." Id. at 266. This principle applies here.
¶ 100. The majority concludes the homeowner's policy did not "apply" to terminate the builder's risk policy "because Fontana and the Accolas insured dif *545 ferent interests in the property." Majority op., ¶ 5. As explained in Ben-Hur, the existence of separate insurable interests does not mean Fontana is entitled to indemnity under its builder's risk policy because the homeowner's insurer already paid for a substantial amount, if not all, of the damage to the home. While Fontana had a separate insurable interest, on remand, Fontana cannot recover damages for a loss that has already been fully covered under the homeowner's policy procured by the Accolas.
¶ 101. Unfortunately, the majority creates dangerous precedent by rewriting an insurance policy, ostensibly to protect a builder from losing coverage for the property before title passes to another. The insurance policy for which Fontana bargained did not provide for such coverage and therefore the majority confers a benefit on Fontana for which Assurance has not been paid. As a result, Fontana could receive a windfall payment from Assurance for a loss it did not suffer because the risk of that loss had already passed to another party; the Accolas have already been paid for the damage to the property despite their status as occupiers rather than owners at the time of the loss. The unique facts of this case are unlikely to arise again unless a similar error in the underwriting process results in the issuance of a builder's risk policy when construction is already substantially completed. Nevertheless, the majority opinion incentivizes "substantial mischief' in the construction industry of a different sort than it fears by permitting a double recovery for but one loss.
¶ 102. In sum, I agree with the majority that interpretation of the insurance policies at issue presents a question of law for this court to decide; therefore, I join Part III of the majority opinion. I do not *546 agree with the majority's interpretation of the builder's risk policy; therefore, I respectfully dissent from Part IV of the majority opinion. Under the unambiguous terms of the builder's risk policy, the homeowner's policy in effect on the date of the loss constituted "permanent property insurance that applies." Coverage under the builder's risk policy ended when coverage under the homeowner's policy took effect.

 See majority op., ¶¶ 5, 58 n.14, 67.