# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP821 |
| COMPLETE TITLE: | Fontana Builders, Inc., <br>        Plaintiff-Appellant-Petitioner, <br> Anchorbank, FSB, <br>        Intervening <br>        Plaintiff-Co-Appellant-Petitioner, <br>    v. <br> Assurance Company of America, <br>        Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 362 Wis. 2d 539, 865 N.W.2d 884)
(CT. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 29, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 15, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Walworth |
| JUDGE: | Phillip A. Koss |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, A. W., J. and ABRAHAMSON, J. concur (Opinion filed). |
| CONCURRED/DISSENTED: | BRADLEY, R. G., J. concurs and dissents (Opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs by *Chris J. Trebatoski* and *Law Offices of Chris J. Trebatoski, LLC*, Milwaukee and oral argument by *Chris J. Trebatoski*.

For the intervening plaintiff-co-appellant-petitioner, there were briefs by *Norman D. Farnam*, *John J. Laubmeier* and *Stroud, Willink & Howard, LLC*, Madison and oral argument by Norman D. Farnum.

For the defendant-respondent, there was a brief by *William W. Ehrke*, and *Crivello Carlson, S.C.*, Milwaukee and *John J. McInerney*, and *Leahy, Eisenberg & Fraenkel*, Chicago. Oral argument by *William W. Ehrke*.

There was an amicus curiae brief by *John E. Knight, Kirsten E. Spira* and *Boardman & Clark LLP*, Madison, on behalf of the Wisconsin Bankers Association.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP821
(L.C. No. 2008CV562)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Fontana Builders, Inc.,**

      **Plaintiff-Appellant-Petitioner,**

**Anchorbank, FSB,**

      **Intervening Plaintiff-
      Co-Appellant-Petitioner,**

    **v.**

**Assurance Company of America,**

      **Defendant-Respondent.**

**FILED**

**JUN 29, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals[1] affirming judgments

---

[1] Fontana Builders, Inc. v. Assurance Co. of Am., No. 2014AP821, unpublished slip op. (Wis. Ct. App. Apr. 1, 2015) (per curiam).

entered in favor of Assurance Company of America[2] (Assurance) against its insured, Fontana Builders, Inc.[3] (Fontana), and Fontana's lender, AnchorBank, FSB (AnchorBank).

¶2   The case involves a complicated insurance coverage dispute arising out of a 2007 fire that destroyed portions of a high-end custom home that was still under construction in Lake Geneva.  The fire caused major damage not only to the home but also to the personal property of the home's occupants, who were the presumptive purchasers of the home upon its completion.

¶3   Both the construction contractor, Fontana, and the occupants/presumptive purchasers, James and Suzy Accola (the Accolas), had separate insurance policies.  After the fire, the Accolas settled with Chubb Insurance Co. (Chubb), the insurer that provided their homeowner's policy, and received a substantial payment.  Assurance then denied all coverage to Fontana for the fire, relying on the "permanent property insurance" condition in its builder's risk policy as grounds for the denial.  Assurance's denial of coverage upset not only Fontana but also Fontana's mortgagee, AnchorBank, and James

---

[2] Though the complaint named "Zurich Assurance Company of America" as a defendant, the parties later agreed that Assurance Company of America was the appropriate party defendant.

[3] Originally incorporated in Illinois in February 2002, Fontana Builders, Inc. involuntarily dissolved on July 10, 2009, after failing to file an annual report and failing to pay an annual franchise tax.

Accola, Fontana's president and sole shareholder who had personally guaranteed AnchorBank's loan.

¶4 In this factually complicated case, there have been two jury trials and two appeals, although this is the first appeal to reach this court. The parties have raised numerous issues. Upon reflection, however, we see two fundamental questions presented to the court. First, is the interpretation of the "permanent property insurance" condition in the builder's risk policy a question of fact for a jury or a question of law for the court? Second, if the interpretation of the "permanent property insurance" condition is a question of law, did that condition terminate Fontana's coverage under the builder's risk policy?

¶5 We conclude that the court of appeals incorrectly determined that interpretation of Assurance's builder's risk policy was a question of fact for a jury in this case, and we reaffirm the general principle that interpretation of insurance contracts presents a question of law for the court. We further conclude that the homeowner's policy in this case did not "apply" so as to terminate Fontana's builder's risk policy because Fontana and the Accolas insured different interests in the property. Fontana had a reasonable expectation that coverage would persist under the builder's risk policy while construction continued and Fontana remained the owner of the property. Accordingly, we reverse the decision of the court of

3

appeals and remand to the circuit court for the determination of damages.[4]

## I. FACTUAL BACKGROUND

### A. Fontana's Construction Business

¶6 Fontana designed and built "spec" homes, speculative custom houses for which Fontana obtained financing and began construction before securing a buyer for the finished structure. When constructing a spec home, Fontana owned the house and was responsible for any mortgage until closing a sale to an eventual buyer. In the years preceding the fire, Fontana had built and sold 16 or 17 custom homes. At any given time, Fontana would normally have between one and three homes under construction.

¶7 James Accola was the president and sole shareholder of Fontana Builders, Inc. On three or four occasions, he and his wife, Suzy Accola, had purchased a completed home from Fontana and moved in with their three children. Before the fire damaged

---

[4] Fontana, AnchorBank, and Assurance devote substantial portions of their briefs to Fontana and AnchorBank's additional argument that, at the second trial, the circuit court improperly permitted the jury to consider evidence of the Chubb settlement under Wis. Stat. § 904.08 (2013-14). Because we reverse based on our interpretation of the Assurance policy, we need not address this issue. See Hofflander v. St. Catherine's Hosp., Inc., 2003 WI 77, ¶102, 262 Wis. 2d 539, 664 N.W.2d 545 ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues." (quoting Hull v. State Farm Mut. Auto. Ins. Co., 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998))).

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

the Lake Geneva home, the Accolas intended to purchase the home after Fontana finished construction.

¶8    The home at issue, located at 1527 Muirfield Court, represented a substantial investment for Fontana.  Nearly all of Fontana's assets were invested in the house, which the company planned to use to generate new opportunities for itself in the high-end housing market.  The home was larger and included more detailed interior work than any previous Fontana-built home.  Accola testified at the second trial that he intended to use the home to "showcase" Fontana as "one of the premier builders in the Lake Geneva area."  As the home's owner, Accola would have unfettered access to an example of Fontana's finished work when he courted prospective buyers.  He had even arranged for a photo spread featuring the house in Trends, a nationally distributed magazine.

¶9    Fontana financed the project's construction through two mortgages with AnchorBank.  The first mortgage, dated November 29, 2005, secured a $1.076 million loan.  A subsequent mortgage, dated April 23, 2007, secured a $200,000 loan.  Accola provided a personal guarantee on Fontana's loans and mortgages.

### B.  Fontana's Builder's Risk Coverage from Assurance

¶10 As a standard condition of making the loans, AnchorBank required Fontana to obtain builder's risk insurance covering the home during construction.  Fontana purchased two policies from Assurance Company of America, which had provided builder's risk coverage for previous Fontana projects. Initially, Fontana purchased a new policy providing up to

5

$800,000 in coverage for the Lake Geneva property.  Effective for one year from October 19, 2005, the policy corresponded to the November 2005 loan from AnchorBank.

¶11  Fontana acquired the Assurance policy at issue in this case when it sought the second AnchorBank loan to cover increased project costs during construction.  Because the previous policy had lapsed in October 2006, Assurance issued a new builder's risk policy providing $1.495 million in coverage, effective for one year from April 19, 2007.[5]  The policy listed "Fontana Builders, Inc." as the named insured.

---

[5] Fontana worked with Scott Anderson from Rand-Tec Insurance Agency when procuring both Assurance policies.  As an agent for Assurance, Anderson used Assurance's computerized underwriting system, which automatically bound and issued a policy when an agent entered information within certain parameters.  At the time that Anderson procured the April 2007 Assurance policy for Fontana, he knew that the project costs had increased substantially since the issuance of the first policy, that the municipality had changed the street address for the home, and that Fontana had completed approximately 18 months worth of work on the project.

Testimony during the first trial called into question Anderson's methods when completing Fontana's application for the second policy.  An underwriter from Zurich Insurance Services explained that the computerized underwriting system in place in April 2007 would place a "hold" on an application if the agent entered numbers requesting builder's risk coverage exceeding $100 per square foot.  A hold would have triggered review by a human underwriter and prevented automatic issuance of the policy.  Anderson entered "15,000" as the home's square footage, and the application never triggered a hold.  Because the home was actually closer to 12,000 square feet in size, the correct coverage-to-size ratio would have exceeded $100 per square foot.  An underwriter testified during the first trial that, had a hold properly occurred, a human underwriter reviewing the application would have declined to issue a policy based on the significant percentage of the structure already completed before April 2007.

¶12 Under the builder's risk policy, Assurance agreed to "pay for direct physical loss to Covered Property from any Covered Cause of Loss described in [the] Coverage Form." Covered Property included "[p]roperty which has been installed, or is to be installed in any commercial structure and/or any single family dwelling, private garage, or other structures that will be used to service the single family dwelling." However, Covered Property did not include existing inventory, which the policy defined as "buildings or structures where construction was started or completed prior to the inception date of [the] policy." The policy defined "loss" as "accidental loss and accidental damage," and "Covered Cause of Loss [meant] risk of direct physical loss to Covered Property, except those causes of loss listed in the Exclusions." The exclusions did not preclude coverage for fire damage.

¶13 A separate section of the policy specified additional conditions for coverage:

> 3.   WHEN COVERAGE BEGINS AND ENDS
>
> We will cover risk of loss from the time when you are legally responsible for the Covered Property on or after the effective date of the policy if all other conditions are met. Coverage will end at the earliest of the following:
>
> a.   Once your interest in the Covered Property ceases;
>
> b.   Ninety days after initial occupancy of the Covered Property . . . [;]
>
> . . . .

7

c.    When the Covered Property is leased to or rented to others[;]

. . . .

d.    When you abandon the reported location with no intention to complete it;

e.    At the end of 12 months from the month when you first reported the location to us unless you report the location again and pay an additional premium. . . . ;

f.    <u>When permanent property insurance applies</u>;

g.    Once the Covered Property is accepted by the owner or buyer.

(Emphasis added.)

C.  The Accolas' Homeowner's Policy from Chubb

¶14 James Accola obtained a 30-day temporary occupancy permit dated May 30, 2007, and, shortly thereafter, the Accolas moved most of their personal property into the home.  Although the Accolas began residing in the home, Fontana continued interior work preparing the home for permanent occupancy. Fontana remained the home's owner and had not yet closed a sale or transferred title to the Accolas.

¶15 In anticipation of purchasing the home, the Accolas acquired a homeowner's policy from Chubb Insurance Co.  The policy listed "Jim Accola" and "Susy [sic] Accola" as the named insureds, and it listed "Anchor Bank" as the mortgagee. Effective for one year from June 21, 2007, the coverage summary explained: "Your policy provides coverage against physical loss if your home or its contents are damaged, destroyed, or lost."

8

It provided $2 million of deluxe coverage for the dwelling and $1 million of deluxe coverage for the home's contents.

¶16  Additionally, the policy provided coverage for extra living expenses under certain circumstances:

> If your house cannot be lived in because of a covered loss, we cover any increase in your living expenses that is necessary to maintain your household's normal standard of living.  We cover these expenses for the reasonable amount of time it should take to repair or rebuild your house, or for your household to relocate, even if the policy period ends during that time.

### D.  The Fire and Its Aftermath

¶17  The fire occurred late on the night of June 28, 2007. A Fontana employee working on the property during the day left rags used for wood staining in the garage, and those rags spontaneously combusted.  Awakened by smoke alarms shortly after falling asleep, Accola immediately smelled smoke in the house. With thick smoke filling the home's interior, Accola retrieved his two youngest children from an upstairs bedroom and exited the house.[6]

¶18  In addition to destroying the garage and a Suburban sitting in the driveway, the fire damaged portions of the residence adjacent to the garage.  Salvageable portions of the property suffered extensive damage from smoke, heat, water, and chemical fire suppressants.  The Accolas lost virtually all their personal property in the fire; many items not yet moved

---

[6] Accola's wife and eldest child were out of town on the night of the fire.

into the house itself were stored temporarily in a bonus room above the garage.

¶19  After the fire, the Accolas submitted a claim to Chubb for damages to their property.  They signed a Non-Waiver Agreement allowing Chubb to investigate the claim without acknowledging that the homeowner's policy provided coverage for the Accolas.[7]  Without admitting that the policy provided coverage to the Accolas for the fire loss, Chubb began adjusting the claim after determining that the policy was in force on the night of the fire and that the policy provided coverage for fire damage generally.  As part of the adjustment process, Chubb procured damage estimates from two restoration companies.  One company estimated fire damages of $1,324,000.35, and the other estimated damages of $1,391,116.54.  While Chubb adjusted the claim, it made various payments to the Accolas totaling $113,686.81, but Chubb made the payments on the condition that

---

[7] By the terms of the agreement, the Accolas and Chubb mutually acknowledged that

> any action taken [by Chubb] . . . in investigating the cause of loss, in investigating whether or not coverage is or was in force, and in investigating and ascertaining the amount of sound value, or the amount of loss and damage which occurred [as a result of the fire] . . . shall not waive or invalidate any of the terms or conditions of any policy or policies, if policy or policies are or were in force, and shall not waive or invalidate any rights whatsoever of either of the parties . . . with respect to any claims or defenses that they may have with respect to the loss and damage.

it could recover the money in the event it determined that the policy did not cover the loss.   Ultimately, the Accolas filed two proofs of loss, one claiming $2,010,683.67 for damages to the structure and the other claiming $509,740 for damages to the home's contents.

¶20  Separate from the Accolas' claim with Chubb, Fontana made a claim with Assurance under the builder's risk policy. Assurance began investigating Fontana's claim after James Accola signed a Non-Waiver Agreement on Fontana's behalf.

¶21  In January 2008, the insurance companies with policies implicated by the fire engaged in mediation in an effort to resolve the various claims made by the Accolas and Fontana. Assurance, Chubb, and Westfield Insurance[8] all participated in

---

[8] Westfield was Fontana's liability insurer at the time of the fire. Accola v. Fontana Builders, Inc., 2010 WI App 143, ¶3, 330 Wis. 2d 41, 792 N.W.2d 635.  After the mediation failed to produce a settlement, the Accolas filed suit against Fontana and Westfield.  The Accolas alleged negligent damage to their personal property caused by the Fontana employee's failure to properly dispose of the rags that caused the fire. Id., ¶¶2-3. The circuit court initially granted summary judgment to Westfield on the grounds that the policy excluded from coverage personal property within Fontana's "care, custody, or control." Id., ¶4.   But the court of appeals reversed that decision, reasoning that Westfield had not demonstrated that the Accolas' personal property was "under the supervision of [Fontana] and necessary to the work involved."   Id., ¶¶12-15 (first citing Meiser v. Aetna Cas. & Sur. Co., 8 Wis. 2d 233, 236, 238, 98 N.W.2d 919 (1959); then citing Silverton Enters., Inc. v. Gen. Cas. Co. of Wis., 143 Wis. 2d 661, 670-71, 422 N.W.2d 154 (Ct. App. 1988)).   The court of appeals remanded the case to the circuit court to determine the extent of Fontana and Westfield's liability to the Accolas.   The Accolas ultimately received $400,000 from Westfield.

11

the mediation, which did not result in a comprehensive settlement.

¶22 Following the mediation, Chubb entered into a settlement agreement with the Accolas.[9] Chubb agreed to pay the Accolas $1.5 million to dispose of their claim. The agreement allocated $519,000 of the settlement proceeds toward "replacement costs of the [Accolas'] personal property" and $330,000 toward their "additional living expenses," with the remainder allocated toward "[a]ny other interest the [Accolas] may have in the premises." The settlement total included the $113,686.81 that Chubb had already paid to the Accolas, as well as outstanding invoices totaling $53,275.54 that Chubb agreed to pay to a restoration company. Chubb agreed to issue two checks to satisfy the balance of the settlement total: one check for $537,323.19 payable to "Jim Accola and Suzy Accola and Anchor Bank," and one check for $795,714.46 payable to "Jim Accola and Suzy Accola." Additionally, the agreement specifically provided that the settlement "[was] not an admission by [Chubb] that coverage is provided under the Policy for the Fire Claim."

¶23 After the Accolas agreed to the settlement with Chubb, Fontana sent a letter to Assurance demanding payment under the builder's risk policy. Drawing on one of the restoration

---

[9] The specific date of the agreement is ambiguous. Though the agreement's introductory language indicates that it is "dated January 31, 2008," the Accolas signed the agreement on March 5, 2008, and Chubb's representative signed the agreement on March 4, 2008.

estimates obtained by Chubb, the letter requested a $1,391,116.52 payment.

¶24 Assurance denied coverage after concluding that the policy did not cover the fire loss for three reasons. First, Assurance claimed that Fontana's coverage ended under the builder's risk policy when the Accolas' homeowner's policy with Chubb became effective on June 21, 2007. The builder's risk policy provided that coverage would end "[w]hen permanent property insurance applies," and Assurance concluded that the homeowner's insurance constituted permanent property insurance that applied, thus terminating the Assurance policy. Second, Assurance asserted that the policy's "other insurance" clause rendered it excess to the Chubb policy and inapplicable because the $1,391,116.52 demanded did not exceed the Chubb policy's $2 million limit. Finally, Assurance asserted that the policy provided no coverage for the portion of the structure that existed prior to the policy's April 2007 effective date.

## II.  PROCEDURAL HISTORY

¶25 Fontana responded to Assurance's denial of coverage by commencing this action on May 6, 2008. The complaint alleged causes of action for breach of the insurance contract and for bad faith failure to pay under the policy.

¶26 Assurance moved for summary judgment, but the Walworth County Circuit Court[10] concluded that the Assurance policy

---

[10] James L. Carlson, Judge.

13

provided coverage for the fire damage.  The circuit court reasoned that the builder's risk policy "was still in force because the builder had not completed the work.  It had not been turned over unconditionally to the owner and was not in the owner's name on the title."  Furthermore, Fontana's interest in the property "had not ceased . . . yet."  Additionally, the court added that it thought the Accolas' settlement with Chubb was irrelevant to its interpretation of the Assurance policy.

¶27  The case proceeded to a bifurcated trial on Fontana's breach of contract and bad faith claims.  Because the court had decided that the Assurance policy provided coverage, the first phase focused on the amount of money owed to Fontana for fire damage to the property.  Accordingly, the jury received a special verdict question at the end of the first phase: "What sum of money will fairly and reasonably compensate the Plaintiff, Fontana Builders, Inc. for the losses it sustained due to the fire at the Muirfield Court property on June 28, 2007?"  A unanimous jury answered $1,391,116.54.

¶28  During the second phase, the jury heard evidence on Fontana's claim that Assurance denied coverage in bad faith.  The jury received a two-part special verdict question.  First, the special verdict form asked, "Did Defendant, Assurance Company of America, exercise bad faith in denying the claim of the Plaintiff, Fontana Builders, Inc.?"  If the jury answered "yes," the form then asked, "What sum of money will fairly and reasonably compensate Plaintiff, Fontana Builders Inc., for Defendant, Assurance Company of America's bad faith in denying

the claim of Fontana Builders?"  Ten of twelve jurors answered "yes" to the first question and awarded $1,218,118 under the second.

¶29 Assurance appealed, and the court of appeals reversed in an unpublished decision.  Fontana Builders, Inc. v. Assurance Co. of Am. (Fontana I), No. 2010AP2074, unpublished slip op. (Wis. Ct. App. Dec. 7, 2011).  The court of appeals concluded that "the circuit court erred when it found as a matter of law that the builder's risk policy provided coverage."  Id., ¶1. Citing its own decision in Central Auto Co. v. Reichert, 87 Wis. 2d 9, 273 N.W.2d 360 (Ct. App. 1978), the court of appeals relied on the proposition that "when the words or terms in [a] contract must be construed using extrinsic evidence, the question is one for the trier of fact."  Id., ¶8.  Applying that legal principle, the court of appeals determined that "the question of whether coverage existed" on the day of the fire presented a question of fact for the jury.  Id., ¶1.

¶30 The court of appeals provided instructions for the second round of circuit court proceedings: "[T]he jury will have to determine whether permanent property insurance applied at the time of the fire.  The circuit court may not preclude the jury from considering the Chubb policy or any other extrinsic evidence that is relevant to Section E.3 of the policy."  Id., ¶11 (footnote omitted).  In addition, the court of appeals noted that any determination as to the applicability of the "other insurance" clause in the Assurance policy "must await the jury's decision as to whether coverage under the builder's risk policy

was still in effect at the time of the fire." Id., ¶13. Fontana filed a petition for review, which this court denied on April 23, 2012.

¶31 After the case returned to the Walworth County Circuit Court, AnchorBank filed a motion to intervene under Wis. Stat. § 803.09(1). AnchorBank asserted an interest in any insurance proceeds due from Assurance in light of a foreclosure default judgment for $1,135,332.90, plus interest, that AnchorBank had recently obtained against Fontana. The circuit court granted the motion to intervene and later granted partial summary judgment to AnchorBank, concluding that "[i]f, and only if, Assurance Company of America pays or is required to pay insurance proceeds in connection with this lawsuit, then, in that event, the insurance proceeds shall be used to restore or repair the property at issue in this lawsuit or paid to AnchorBank."

¶32 The circuit court[11] conducted a new trial to determine whether the Accolas' Chubb policy terminated Fontana's builder's risk policy from Assurance because permanent property insurance applied to the Lake Geneva home. Over Fontana's objection, the circuit court allowed the admission of evidence related to the Accolas' negotiated settlement with Chubb. Fontana argued that Wis. Stat. § 904.08 barred evidence pertaining to the Chubb settlement. The circuit court, however, determined that the

---

[11] Phillip A. Koss, Judge.

16

directive from the court of appeals——that "[t]he circuit court may not preclude the jury from considering the Chubb policy or any other extrinsic evidence that is relevant to Section E.3 of the policy," Fontana I, unpublished slip op., ¶11——contemplated admission of the settlement evidence.

¶33 At trial, the special verdict form presented two questions to the jury: (1) "Was the policy of insurance issued by Chubb/Pacific Indemnity to James Accola and Suzy Accola permanent property insurance?"; and (2) "Did the policy of insurance issued by Chubb/Pacific Indemnity to James Accola and Suzy Accola apply to the fire loss?" Before deliberations, the court instructed the jury as to the meaning of various terms necessary to interpret the policy:

> For the purposes of determining your answers to Questions 1 and 2, you are instructed that "permanent" means "continuing or enduring without marked change in status or condition or place."
>
> You are further instructed that the term "applies" means "to be pertinent, suitable, or relevant."
>
> An insurance company [sic] does not "apply" merely because it is bound, obtained or issued.
>
> Generally, a person cannot obtain insurance coverage unless they have an "insurable interest" to protect. A party has an "insurable interest" in property if its destruction would subject it to a loss. A party may have an "insurable interest" in property even if that party does not have title.

The jury answered "yes" to both special verdict questions, with one juror dissenting as to the first question. Because the jury's answers meant that the Assurance policy did not provide

17

coverage for Fontana's fire loss, the court did not try Fontana's bad faith claim.

¶34  While the jury deliberated, the circuit court ruled on Assurance's argument that the "other insurance" clause in the builder's risk policy rendered the policy excess to the Accolas' Chubb policy.  Concluding that the "other insurance" clause did not apply, the court explained its reasoning from the bench:

> There are clearly two different insureds here. One is Fontana Builders.  That is on the Zurich or Assurance Company policy.  The Pacific Indemnity/Chubb policy covers different insureds, Jim and Suzy Accola.
>
> . . . .
>
> Frankly, Assurance was paid premiums to cover this loss.  That's what they contracted with. [Accola] also contracted, at the requirement of AnchorBank, as a personal individual to get homeowner's insurance.  They are not the same insureds.  They do not cover the same loss because until the keys are turned over, as the plaintiff has said, it's not their home.  It clearly could cover a structure, at some point.  Time of closing, keys are turned over.
>
> . . . .
>
> Therefore, the "other insurance" clause is inapplicable because "other insurance" clauses apply only when the "other insurance" "covers the same property and interest against the same risk in favor of the same party."  And there I'm citing from 44 Am.Jur. 2d on Insurance, Section 1273, Identity of Interest.

18

Frankly, the Chubb policy covers the Accolas' personal property that was lost in the fire. The Assurance policy covers the building itself.[12]

The fact that Mr. Accola chose to reinvest in the property is what I find the facts to be, or in the corporation, by paying off its debt to Fontana Builders.

"The evils which [the] 'other insurance' clauses are designed to prevent are not present where each policy insures only the interest held by each separate owner of an insurable interest in the property."

Because of this, the "other insurance" defense should, in my opinion, fail.

(Emphasis added.)

¶35 Fontana and AnchorBank both appealed from the jury verdict. Fontana Builders, Inc. v. Assurance Co. of Am. (Fontana II), No. 2014AP821, unpublished slip op. (Wis. Ct. App. Apr. 1, 2015) (per curiam). The court of appeals affirmed, observing that, "[o]n remand, the trial court did precisely as we directed. It permitted the jury to consider the Chubb policy, payments made pursuant to it, and extrinsic evidence relevant to Section E.3." Id., ¶8. Based on the evidence, the court of appeals saw no reason to disturb the jury's verdict because "the jury reasonably could have found that the Chubb policy was 'permanent' and 'applied,' thus terminating Fontana's coverage under the Assurance builder's risk policy." Id., ¶¶7-9. Furthermore, the circuit court's decision to admit evidence

---

[12] See infra ¶62 for our clarification of the distinct interests insured by Fontana's Assurance policy and the Accolas' Chubb policy, respectively.

19

pertaining to the Chubb settlement did not violate Wis. Stat. § 904.08 because "evidence regarding the Chubb policy, the prompt adjustment activity, the substantial payments made, and the nature of those payments was not admitted in the context of settlement discussions." Id., ¶10.

¶36 On May 14, 2015, Fontana and AnchorBank filed petitions for review. We granted both petitions on September 9, 2015.

### III.  STANDARD OF REVIEW

¶37 We rely on well-established principles when interpreting an insurance policy:

> The interpretation of an insurance contract is a question of law subject to de novo review. An insurance policy is construed to give effect to the intent of the parties, expressed in the language of the policy itself, which we interpret as a reasonable person in the position of the insured would understand it. The words of an insurance policy are given their common and ordinary meaning. Where the language of the policy is plain and unambiguous, we enforce it as written, without resort to rules of construction or principles in case law. . . . Contract language is considered ambiguous if it is susceptible to more than one reasonable interpretation. If the language is ambiguous, it is construed in favor of coverage. In interpreting an insurance policy, the court may also consider the purpose and subject matter of the insurance.

Danbeck v. Am. Fam. Mut. Ins. Co., 2001 WI 91, ¶10, 245 Wis. 2d 186, 629 N.W.2d 150 (citations omitted).

¶38 This court consistently states that interpretation of an insurance contract is a question of law that we review de novo. Schinner v. Gundrum, 2013 WI 71, ¶35, 349 Wis. 2d 529,

20

833 N.W.2d 685; Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co., 2009 WI 73, ¶30, 319 Wis. 2d 52, 768 N.W.2d 596; Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶27, 315 Wis. 2d 556, 759 N.W.2d 613; Doyle v. Engelke, 219 Wis. 2d 277, 283-84, 580 N.W.2d 245 (1998); Cardinal v. Leader Nat'l Ins. Co., 166 Wis. 2d 375, 382, 480 N.W.2d 1 (1992); Katze v. Randolph & Scott Mut. Fire Ins. Co., 116 Wis. 2d 206, 212, 341 N.W.2d 689 (1984) (first citing Westerman v. Richardson, 43 Wis. 2d 587, 591, 168 N.W.2d 851 (1969); then citing Rabinovitz v. Travelers Ins. Co., 11 Wis. 2d 545, 549, 105 N.W.2d 807 (1960); then citing Thurston v. Burnett & Beaver Dam Farmers' Mut. Fire Ins. Co., 98 Wis. 476, 478, 74 N.W. 131 (1898); and then citing Ganson v. Madigan, 15 Wis. 158 (*144) (1862)); see Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶17, 360 Wis. 2d 129, 857 N.W.2d 136; Blasing v. Zurich Am. Ins. Co., 2014 WI 73, ¶20, 356 Wis. 2d 63, 850 N.W.2d 138.

¶39 On the first appeal in this case, the court of appeals articulated an exception to that general rule: "While the interpretation of a contract is normally a matter of law for the court to decide, when the words or terms in the contract must be construed using extrinsic evidence, the question is one for the trier of fact." Fontana I, unpublished slip op., ¶8. Applying the exception, the court of appeals explained that, "[g]iven the policy language, and the dispute over its application to the extremely unique facts presented here, the issue of whether the builder's risk policy ended because 'permanent property

21

insurance applies' . . . is not a question of law for the court, but rather a question of fact for the jury." Id., ¶10.

¶40 Our standard of appellate review in this case turns upon the proper allocation of responsibility for interpreting the "permanent property insurance" condition in the Assurance policy. As stated above, if interpretation of the Assurance policy presents a question of law, then we conduct a de novo review. If, however, interpretation of the Assurance policy is properly a question of fact, then we will sustain the jury's verdict if there is any credible evidence to support it. Morden v. Continental AG, 2000 WI 51, ¶38, 235 Wis. 2d 325, 611 N.W.2d 659.

¶41 We conclude that the court of appeals in this case misapplied the extrinsic evidence rule by allowing the jury to resolve the dispute over the proper application of the Assurance policy's language to the facts.

¶42 As support for the extrinsic evidence exception, the court of appeals relied on its own decision in Central Auto, in which it stated, "Construction of a written contract is normally a matter of law for the court, but where words or terms are to be construed by extrinsic evidence, the question is one for the trier of fact." Central Auto, 87 Wis. 2d at 19. Central Auto involved interpretation of a lease, rather than an insurance policy. Id. at 18-20 (holding that jury should have received evidence from parties' lease negotiations to determine intended meaning of term "bookstore" in the lease). The Central Auto court cited Pleasure Time, Inc. v. Kuss, 78 Wis. 2d 373, 379,

22

254 N.W.2d 463 (1977), in which this court approved of a finder of fact interpreting a land contract by considering parties' testimony and drafts of the contract. Pleasure Time, 78 Wis. 2d at 379-80.

¶43 Notably, both Central Auto and Pleasure Time involved extrinsic evidence used to ascertain the parties' understandings of the contracts' terms at the time the parties entered into the agreements. Allowing the jury to resolve factual disputes about contract formation is consistent with the contract principle that "whether both parties agreed to be bound" by a contract is a question of fact. 5 Margaret N. Kniffin, Corbin on Contracts § 24.30, at 326 (Joseph M. Perillo ed., rev. ed. 1998). However, the parties' respective understandings at the time they entered into a contract present a different question from the application of a contract to a given set of facts: "Determination of the legal operation of a contract . . . after the meaning of its language has been determined by process of interpretation, is always for the court, because legal operation is the result of applying rules of law to the facts." Id. at 338-39 (footnote omitted).

¶44 Because insurance policies are contracts, "[w]ords and phrases in insurance contracts are subject to the same rules of construction that apply to contracts generally." Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶15, 257 Wis. 2d 80, 654 N.W.2d 225. In various insurance cases, this court has mentioned the extrinsic evidence rule applied by the court of appeals in this case: "The construction of an insurance policy

23

is generally a matter of law for the court, although in a case of ambiguity where words or terms are to be construed by extrinsic evidence, the question is one for the fact-finder." Kraemer Bros., Inc. v. U.S. Fire Ins. Co., 89 Wis. 2d 555, 561-62, 278 N.W.2d 857 (1979); see also Frost, 257 Wis. 2d 80, ¶5; Maas ex rel. Grant v. Ziegler, 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992); Lambert v. Wrensch, 135 Wis. 2d 105, 115 n.8, 399 N.W.2d 369 (1987); RTE Corp. v. Md. Cas. Co., 74 Wis. 2d 614, 620-21, 247 N.W.2d 171 (1976); Bauman v. Midland Union Ins. Co., 261 Wis. 449, 451-52, 53 N.W.2d 529 (1952); French v. Fid. & Cas. Co. of N.Y., 135 Wis. 259, 269, 115 N.W. 869 (1908).

¶45 Sweeping statements like the language in Kraemer Bros. seem to suggest that interpretation of an insurance policy's language is a question of fact for the jury any time that a dispute over policy language involves extrinsic evidence. But careful examination of the extrinsic evidence rule's history in the insurance context demonstrates that, as in contracts cases like Central Auto and Pleasure Time, interpretation of an insurance contract becomes a question for the jury only when necessary to resolve factual disputes about the parties' understandings at the time they entered into the contract.[13]

---

[13] Cf. Tower Ins. Co. v. Chang, 230 Wis. 2d 667, 672, 601 N.W.2d 848 (Ct. App. 1999) ("There is no dispute about what the girls did. The question is whether their actions were for a church activity or activity performed on behalf of the church, within the meaning of the policy. Whether their actions come
(continued)

¶46 This court explained the rule's background in Kraemer Bros.:

> The construction of an insurance policy is generally a matter of law for the court, although in a case of ambiguity where words or terms are to be construed by extrinsic evidence, the question is one for the fact-finder.  The rule stated in Thurston v. Burnett & Beaver Dam Farmers' Mut. Fire Ins. Co., 98 Wis. 476, 478, 479, 74 N.W. 131 (1898), was recently quoted with approval in RTE Corp. v. Maryland Casualty Co., 74 Wis. 2d 614, 621, 247 N.W.2d 171 (1976):
>
> "'. . . The case comes clearly within the rule that where language is plain and unambiguous, the apparent import of the words must govern, and the rule that where there is no uncertainty as to the meaning of the words used in the contract, and where such uncertainty exists but there is no extrinsic evidence or circumstance bearing on the subject to be considered in determining the meaning attributed to them by the parties when the contract was made, the proper interpretation of the words and construction of the contract are solely for the court.'"
>
> See also Pleasure Time, Inc. v. Kuss, 78 Wis. 2d 373, 379, 254 N.W.2d 463 (1977).

Kraemer Bros., 89 Wis. 2d at 561-62 (emphasis added).

¶47 In Bauman, the court quoted the same language from Thurston, as well as a concluding sentence, "Therefore the trial court erred in leaving the construction of the contract to the jury."  Bauman, 261 Wis. at 452 (quoting Thurston, 98 Wis. at 479).

¶48 Despite the broad phrasing of the rule in Kraemer Bros., the case law at the foundation of the court's statement

---

under this umbrella is a matter of contractual construction requiring de novo review." (emphasis added)).

25

indicates that interpretation of a contract——insurance or otherwise——creates a question of fact for the jury only when extrinsic evidence illuminates the parties' understandings at the time they entered into the agreement.  See Thurston, 98 Wis. at 478-79.  Furthermore, neither Kraemer Bros. nor RTE Corp. nor Bauman nor Thurston involved extrinsic evidence; interpretation of the insurance contracts remained squarely a matter of law for the court.   Kraemer Bros., 89 Wis. 2d at 562; RTE Corp., 74 Wis. 2d at 621; Bauman, 261 Wis. at 451-52; Thurston, 98 Wis. at 478-79.   Thus, where a dispute turns upon application of an insurance policy to underlying facts, interpretation of the insurance policy presents a question of law for the court.

¶49  In this case, a determination as to whether "permanent property insurance applie[d]" was not an appropriate question for the jury.  Assurance and Fontana do not argue that extrinsic evidence explains their respective understandings of the phrase "permanent property insurance applies" at the time that Assurance issued the policy.  Rather, they dispute whether the Chubb policy constituted permanent property insurance that applied so as to terminate Fontana's builder's risk coverage. In other words, they disagree as to whether the Assurance policy applies as a matter of law to the underlying facts.  Because resolving that dispute requires interpretation of the Assurance policy and application of the policy to the facts, we now conduct a de novo review of the policy.

IV.  INTERPRETING THE ASSURANCE POLICY

¶50 This court has set forth a three-step analysis for determining whether an insurance policy provides coverage. Acuity v. Chartis Specialty Ins. Co., 2015 WI 28, ¶28, 361 Wis. 2d 396, 861 N.W.2d 533; Preisler, 360 Wis. 2d 129, ¶22; Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65. First, the court examines the facts to determine whether the insuring agreement provides an initial grant of coverage, and the analysis ends if the policy does not provide an initial grant. Preisler, 360 Wis. 2d 129, ¶22. Second, if the policy initially grants coverage, the court then considers the exclusions to determine whether any of them preclude coverage. Am. Girl, 268 Wis. 2d 16, ¶24. Finally, if an exclusion applies, the court determines whether any exceptions to the exclusion reinstate coverage. Acuity, 361 Wis. 2d 396, ¶28.

¶51 Assurance has not argued in this court that any of the exclusions apply, so our analysis focuses on determining whether the policy provides an initial coverage grant. The provision at issue here appears in Subsection E.3 of the policy. Section E's heading is "Additional Conditions," and subsection 3's heading is "When Coverage Begins and Ends." Subsection 3 provides that "[c]overage will end at the earliest of the following" and goes on to list the various termination circumstances quoted above, see supra ¶13, including "[w]hen permanent property insurance applies." Rather than excluding otherwise available coverage based on the nature of the loss, the condition, if given effect, would completely terminate coverage of the risk, meaning the

27

policy would not provide an initial grant of coverage at all. Because the coverage provisions in the builder's risk policy would normally provide coverage for a fire loss, whether the policy provides an initial grant of coverage turns upon whether "permanent property insurance applie[d]" so as to terminate coverage.

¶52 The Assurance policy does not define "permanent property insurance." Nor does the policy define what it means for permanent property insurance——whatever it may be——to "apply." Assurance contends that Chubb's payments to the Accolas demonstrate that permanent property insurance applied to the fire loss, thus terminating the Assurance policy. Fontana counters that its insurable interest as a builder was distinct from the Accolas' interests as occupiers and potential purchasers. Along with AnchorBank, Fontana emphasizes that allowing third-party potential purchasers like the Accolas to unilaterally terminate the Assurance policy by acquiring homeowner's insurance would be inconsistent with Fontana's reasonable expectations as an insured.

¶53 Policy language is ambiguous when "susceptible to more than one reasonable construction." Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶11, 342 Wis. 2d 311, 818 N.W.2d 819 (quoting Stubbe v. Guidant Mut. Ins. Co., 2002 WI App 203, ¶8, 257 Wis. 2d 401, 651 N.W.2d 318). "Where an ambiguity exists in a grant of coverage, we will construe the policy against the drafter, and in favor of the reasonable expectations of the insured." Id. (citing Folkman v. Quamme, 2003 WI 116, ¶¶16-17,

28

264 Wis. 2d 617, 665 N.W.2d 857); see also Burgraff v. Menard, Inc., 2016 WI 11, ¶22, 367 Wis. 2d 50, 875 N.W.2d 596; Acuity v. Chartis Specialty Ins. Co., 2015 WI 28, ¶¶24-25, 361 Wis. 2d 396, 861 N.W.2d 533; Wilson Mut. Ins. Co. v. Falk, 2014 WI 136, ¶¶23-24, 360 Wis. 2d 67, 857 N.W.2d 156; Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶23, 338 Wis. 2d 761, 809 N.W.2d 529; Froedtert Mem'l Lutheran Hosp., Inc. v. Nat'l States Ins. Co., 2009 WI 33, ¶41, 317 Wis. 2d 54, 765 N.W.2d 251; State Farm Mut. Auto. Ins. Co. v. Bailey, 2007 WI 90, ¶22, 302 Wis. 2d 409, 734 N.W.2d 386.

¶54 Read in isolation, the phrase "when permanent property insurance applies" seems to present an ambiguity. The policy provides no explicit guidance as to the meaning of the term "applies." To whom or to what must permanent property insurance apply for coverage to end? The provision is indefinite at best.

¶55 Although mere disagreement among or between parties does not render policy language ambiguous, see Hirschhorn, 338 Wis. 2d 761, ¶23, the parties' arguments in this case illustrate the ambiguity. On the one hand, an insured builder might reasonably expect builder's risk coverage to end when the builder completes construction and the owner——be it the builder or a new owner——purchases a policy to provide adequate coverage for the finished structure. On the other hand, a party might conclude that it is reasonable for builder's risk coverage to end when any other property insurance applies to the property, regardless of the party purchasing coverage or the particular interest insured.

29

¶56 For guidance interpreting the phrase "when permanent property insurance applies," we expand the analysis to consider the phrase within the context in which it appears.  "A term that is potentially ambiguous when read in isolation may be clarified by reference to the policy as a whole, and we will, therefore, examine the effect of individual terms within the context of the entire policy when resolving claimed ambiguities."  Wadzinski, 342 Wis. 2d 311, ¶16 (citing Blum v. 1st Auto & Cas. Ins. Co., 2010 WI 78, ¶20, 326 Wis. 2d 729, 786 N.W.2d 78).

¶57 Considering the phrase "when permanent property insurance applies" in context suggests that the phrase speaks to the builder's interest in the property.  As discussed above, the phrase appears within a section delineating circumstances under which the policy terminates.  See supra ¶¶13, 51.  Of the seven circumstances giving rise to termination, five obviously pertain to changes in the builder's interest in the property: cessation of the builder's interest, sustained occupancy of the structure, rental or lease of the property, abandonment by the builder, and acceptance by the owner or buyer.  A sixth circumstance terminates the policy, absent renewal, when the builder maintains its interest over multiple years.  Collectively, these termination conditions end coverage upon a change in the builder's interest as initially insured under the policy.

¶58 The circumstance at issue in this case——"when permanent property insurance applies"——is the only one that does not explicitly relate to the builder's interest in the property.  Accordingly, based on its context, we read the phrase "when

30

permanent property insurance applies" as addressed to the builder's insured interest in the property.[14]  Hence, we examine the interests covered by the Assurance and Chubb policies to determine whether the existence of the Chubb policy terminates Fontana's coverage with Assurance.

¶59 This court has explained the broad scope of insurable interests:

> A person need not have an absolute insurable right of property in the thing insured or even a special limited interest.  It is sufficient if a person's relationship to the property is such he would reasonably be expected to suffer a loss by the destruction of the property or to derive a benefit from its continued existence.  Neither a legal nor an

---

[14] At the time of the fire, Fontana undeniably maintained its interest in the property in its capacity as the builder/owner.  As the concurrence/dissent observes, "Barbara R. Holden, the supervisor of builder's risk insurance underwriting at Assurance," testified during a deposition

> that builder's risk insurance covers "structures under construction, renovations, or additions" along with "materials that will be installed by the builder." Furthermore, a builder's risk policy is a temporary form of insurance that "ends once the construction is considered completed, as defined in the policy.  It is then up to the owner to obtain permanent property insurance on the newly constructed property."

Concurrence/dissent, ¶93.  The concurrence/dissent acknowledges in the next paragraph, however, that at the time of the fire, "the Accolas had not yet closed on the home" and "construction was essentially [but not actually] completed."  Id., ¶94 (emphasis added).  Because builder's risk coverage generally persists until construction ends, Fontana could reasonably expect that the builder's risk policy remained in place while construction of the home continued.

31

> equitable interest nor any property interest as such in the subject matter is necessary.

Ben-Hur Mfg. Co. v. Firemen's Ins. Co. of N.J., 18 Wis. 2d 259, 262, 118 N.W.2d 159 (1962).

¶60 As the court of appeals discussed in Society Insurance v. Capitol Indemnity Corp., 2003 WI App 61, 260 Wis. 2d 549, 659 N.W.2d 875, distinct parties can have distinct insurable interests in a single property. After a fire damaged a restaurant in Milwaukee, the restaurant operator who leased the building made a claim and received payment under his "businessowner's property and liability insurance" policy. Soc'y Ins., 260 Wis. 2d 549, ¶¶2-4. The restaurant operator's insurer sought contribution from the insurer that provided a "Lessor's Risk" policy to the building's owner. Id., ¶¶3-5. Emphasizing the distinction between the restaurant operator and the building's owner, as well as their separate interests in the property, the court of appeals denied contribution. Id., ¶¶18, 22. Distinguishing an insurable interest "as owner" from an interest "as lessee/operator," the court of appeals explained that "[i]nterest . . . addresses how the insured is connected to the property——such as fee simple versus leasehold, or seller versus buyer versus builder." Id., ¶¶15, 21 (citing St. Paul Fire & Marine Ins. Co. v. Protection Mut. Ins. Co., 607 F. Supp. 388, 391 (S.D.N.Y. 1985)).

¶61 Indeed, Couch on Insurance has highlighted circumstances under which a builder and a purchaser might have consequentially distinct insurable interests:

32

> [A]n insurer under a builder's risk policy obtained by a contractor and an insurer under a fire policy obtained by a purchaser, who occupied the dwelling prior to conveyance of the title by the contractor, could not prorate a loss, though each policy contained pro rata clauses, <u>because each policy covered a separate insurable interest</u>.

15 Steven Plitt, et al., <u>Couch on Insurance</u>, § 219:16, at 219-24 (3d ed. 2005) (citing <u>Peerless Ins. Co. v. Bailey Mortg. Co.</u>, 345 F.2d 14 (5th Cir. 1965)).

¶62 In this case, examination of the interests at issue stems from the pivotal difference between the Accolas and Fontana Builders, Inc., a closely held corporation. This court recognizes that "the corporation is a separate entity and is treated as such under all ordinary circumstances." <u>Consumer's Co-op. of Walworth Cty. v. Olsen</u>, 142 Wis. 2d 465, 474, 419 N.W.2d 211 (1988) (quoting <u>Milwaukee Toy Co. v. Indus. Comm'n of Wis.</u>, 203 Wis. 493, 495, 234 N.W. 748 (1931)). Piercing the corporate veil is appropriate only when "applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim." <u>Id.</u> at 475 (quoting <u>Milwaukee Toy</u>, 203 Wis. at 496). The distinction between a corporation and its shareholders applies in the insurance context. <u>Stebane Nash Co. v. Campbellsport Mut. Ins. Co.</u>, 27 Wis. 2d 112, 121, 133 N.W.2d 737 (1965) (declining to adopt corporation's contention that it "was only a form of doing business and that the interest of the corporation and the [shareholders], the owners of the land, were one and the same and that there was a continuity of interest" where doing so

33

would "permit the corporation to assert the insurable interest that the [shareholders] had in the building").

¶63 At the second trial in this case, the circuit court reaffirmed that Fontana was a legal entity separate and distinct from its sole shareholder, James Accola. Fontana had an interest in the Lake Geneva home as a builder and the property's owner. To guard against risk of loss of that interest——of the building materials, the finished structure, and value added by the corporation's labor——Fontana sought and secured builder's risk insurance from Assurance. Separate from Fontana's interest, James and Suzy Accola had an interest in the property as occupiers and future purchasers. As a prerequisite to completing the prospective purchase, and to guard against the risk of loss to their belongings already on the premises, the Accolas sought and secured homeowner's insurance from Chubb. Both Fontana and the Accolas acquired insurance protecting the property, but they were distinct legal entities insuring distinct interests in that property.

¶64 Consequently, the Accolas' acquisition of the Chubb policy for their interest as occupants and prospective purchasers did not trigger the Assurance policy's termination provision because the Chubb policy did not apply to the same interest as the Assurance policy. The Chubb policy in no way covered Fontana's interest as a builder and owner; therefore, it

did not "apply" so as to supersede the builder's risk coverage.[15]
Furthermore, the Accolas' settlement with Chubb does not change
the analysis because even if Chubb had acknowledged that the
policy provided coverage——which the settlement expressly
disclaimed——any payments to the Accolas would speak to their
interest insured by Chubb rather than Fontana's interest insured
by Assurance.

¶65 Maintaining the legal distinction between Fontana and
James Accola provides a crucial perspective for our
interpretation.  Because Fontana and the Accolas are not legally
coextensive, the Accolas' legal status relative to Fontana is

---

[15] Because we conclude that the Chubb policy did not
"apply," we need not determine whether it was "permanent
property insurance."

Our focus on whether the Chubb policy "applied," rather
than on whether it was "permanent property insurance," also
distinguishes this case from the only other available case
interpreting a builder's risk policy provision that terminated
coverage "when permanent property insurance applies."  The case
comes from the United States District Court for the District of
Rhode Island.  Indian Harbor Ins. Co. v. Assurance Co. of Am.,
No. CA 08-146 ML, 2010 WL 2365571 (D.R.I. May 21, 2010),
recommendation adopted 2010 WL 2346654 (D.R.I. June 9, 2010).
Assurance had issued a builder's risk policy to "Curanderismo,
Inc." while the corporation renovated a building.  Id. at *4.
Shortly after Assurance issued the policy, "Indian Harbor issued
a Commercial Property Policy . . . to Mile Square Lofts,
Curanderismo, Inc. as Trustee."  Id.  Curanderismo sought
coverage under both policies after a portion of the building
collapsed during the renovation.  Id. at *5.  Concluding that
the phrase "permanent property insurance" was "not ambiguous,"
the court determined that the building "was insured under a
policy of permanent property insurance prior to the Loss——thus
terminating the Assurance policy prior to the Loss."  Id. at
**5-6.

identical to that of <u>any</u> third party that might have sought to purchase a home from Fontana.  If the Accolas' acquisition of a homeowner's policy operated to terminate Fontana's builder's risk policy from Assurance, any third-party prospective purchaser acquiring a homeowner's policy in anticipation of closing a sale could similarly terminate a builder's risk policy containing this language.

¶66 Empowering prospective purchasers to terminate a builder's insurance coverage——even without the builder's knowledge of the termination——would risk substantial mischief in the construction industry by undermining builders' reasonable expectations.  As amicus Wisconsin Bankers Association explained and testimony in this case bore out, it is standard practice for banks making loans to construction companies to require those companies to maintain builder's risk insurance throughout the construction process.  Testimony at the second trial also indicated that banks making loans to home purchasers generally require purchasers to obtain insurance on the property prior to any dispensation of loan funds.  Thus, any builder who procures a policy that terminates "when permanent property insurance applies" could face a time period near the end of construction in which the builder would have no insurance coverage for the property while a prospective purchaser prepares for closing—— even if construction on the property continues and the prospective sale ultimately fails to close.

¶67 Leaving builders exposed to such uninsured risk of loss would thoroughly frustrate their reasonable expectations.

See <u>Taylor v. Greatway Ins. Co.</u>, 2001 WI 93, ¶10, 245 Wis. 2d 134, 628 N.W.2d 916 ("[I]nterpretation of language in an insurance policy should advance the insured's reasonable expectations of coverage."). At the second trial, James Accola testified that he expected Fontana's coverage from Assurance would continue until Fontana transferred title to new owners, presumably James and Suzy Accola. Fontana continued construction on the premises even after the Accolas began to occupy the home, and Fontana never closed a sale to the Accolas. Like any third-party builder preparing arrangements with a prospective purchaser, Fontana could reasonably expect that its builder's risk coverage would persist while it remained the titled owner and finished construction on the property.

¶68 Assurance, as the drafter of the policy, had the opportunity to set forth in clear terms the circumstances envisioned by the phrase "when permanent property insurance applies." Absent unambiguous language to the contrary in a policy, we will not ask so much of builders as to require them reasonably to expect that their builder's risk coverage will terminate when third-party prospective purchasers procure property insurance without the builder's knowledge.

## V. CONCLUSION

¶69 Legally distinct entities had different interests in the Lake Geneva property at issue in this case. Although the Accolas occupied the property on the date of the fire, their occupancy did not alter Fontana's insured interest: construction on the property continued, and Fontana remained the property's

owner because sale to the Accolas had not yet closed. Interpreting an ambiguous clause in an insurance policy to allow a third party to unilaterally terminate a builder's risk insurance policy without the insured builder's knowledge totally defeats the builder's reasonable expectation of coverage. Reaffirming the longstanding principle that interpretation of insurance contracts generally presents a question of law for the court, we conclude that the homeowner's policy issued by Chubb to the Accolas did not "apply" so as to terminate Fontana's builder's risk policy from Assurance.  Thus, we reverse the decision of the court of appeals and remand to the circuit court for a determination of Fontana and AnchorBank's remaining damages.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶70 ANN WALSH BRADLEY, J. *(concurring)*. I agree with the majority that interpretation of the insurance polices at issue presents a question of law. Majority op., ¶5. I also agree that Fontana Builders, Inc. (Fontana) had a reasonable expectation that the builder's risk policy would persist while construction continued.

¶71 Further, I share the majority's concern over potential purchasers being able to unilaterally terminate a builder's risk policy and agree that Fontana's builder's risk policy covered a different interest in the property than the Accolas' homeowner's policy from Chubb Insurance Co. (Chubb). Id., ¶¶49, 66.

¶72 We part ways, however, when it comes to the interpretation of the clause at issue. The clause provides that Fontana's coverage will end "[w]hen permanent property insurance applies." Like the concurrence/dissent, I conclude that in this clause the meaning of "applies" is not ambiguous and does not depend upon a contextual analysis of the policy's other termination provisions. Concurrence/dissent, ¶89. As the concurrence/dissent determines, I likewise determine that the word "applies" refers to the application of "permanent property insurance" to the property covered by the policy. Id., ¶90.

¶73 This conclusion begs the question of what property is covered by the Accolas' homeowner's policy. A resolution of this question requires an examination of the Accolas' insurable interests.

¶74 Under Wisconsin law, an individual must have an insurable interest in the property insured. Stebane Nash Co. v.

1

Campbellsport Mut. Ins. Co., 27 Wis. 2d 112, 118-19, 133 N.W.2d 737 (1965). Absent an insurable interest, an insurance contract is void as against public policy. Id.; 3 Steven Plitt, et al., Couch on Insurance § 41:1, at 41-7 (3d ed. 2011). Where there is no interest in the property, an insurance policy is merely a wagering agreement, "permit[ting] one man to profit by the losses of another." Tischendorf v. Lynn Mut. Fire Ins. Co., 190 Wis. 33, 39, 208 N.W. 917 (1926).

¶75 One need not have legal title to a property in order to have an insurable interest. Ben-Hur Mfg. Co. v. Firemen's Ins. Co. of N.J., 18 Wis. 2d 259, 262, 118 N.W.2d 159 (1962). The owner of an equitable title has an insurable interest. "For example, an insurable interest may exist in a person who has purchased but not yet received title to the property." 3 Steven Plitt, et al., Couch on Insurance § 41:13, at 41-41-42.

¶76 Further, although "[o]ccupancy alone is insufficient to establish an insurable interest in property," a tenant's expenditures for improvements could create an insurable interest in the building. 33-195 Appleman on Insurance Law and Practice § 195.01 (2016). Limited or qualified interests in property, whether legal or equitable, are sufficient to establish an insurable interest. Id.

¶77 However, where an insured has an insurable, but qualified or limited interest in the property, "he may not recover the full value [of the property] or an amount exceeding his actual interest in the res . . . the general rule is that the insured is limited in recovery to the value of his actual

interest in the property insured." Stebane Nash, 27 Wis. 2d at 120 (quoting 3 Richards, Insurance § 503 at 1613 (5th ed.)); see also 33-195 Appleman on Insurance § 195.01.

¶78 Unsurprisingly, this rule is echoed in the Accolas' homeowner policy from Chubb. It provides:

> We will not pay for any loss to property in which you or a family member does not have an insurable interest at the time of the loss.

> If more than one person has an insurable interest in covered property, we will not pay for an amount greater than your interest, up to the amount of coverage that applies.

In other words, the policy will not pay for a loss if there is no insurable interest in the covered property.

¶79 Here, the record indicates that the Accolas' interests in the property were consistent with those of an occupier. It is undisputed that the house was still being built, it had not been turned over unconditionally, and the Accolas did not have legal title to the property. The court of appeals observed that the Accolas even maintained renters insurance. Fontana Builders, Inc. v. Assurance Co. of America, No. 2010AP2074, unpublished slip op., ¶11 n.3 (Wis. Ct. App. Dec. 7, 2011). At the time of the fire, their relationship to the property was that of occupiers. Accordingly, the Accolas' insurable interests included their interest in the personal property they kept in the home and their interest in living expenses.

¶80 Although the majority suggests that the Accolas' had an interest in the property as "future purchasers," I am not convinced. Majority op., ¶63. It is not asserted that the

3

Accolas made substantial expenditures or improvements in reliance on purchasing the property. Further, the majority correctly rejected the argument that the Accolas had other insurable interests in the property by virtue of their shareholder relationship with Fontana and the Accolas' interests as guarantors of Fontana's loans. Nothing suggests that the Accolas had an interest in the property aside from their occupancy of it.

¶81 The interests of a tenant are not the same as the interests of a landowner. See Society Ins. v. Capitol Indem. Corp., 2003 WI App 61, ¶¶19, 23, 260 Wis. 2d 549, 659 N.W.2d 875. In this case, for example, the Accolas' did not have an interest in the building such that they would be responsible for its repair. The building had not been completed by Fontana, it had not been purchased by Accola, and title had not been transferred. Thus, the circuit court correctly concluded, "[the homeowner's policy and the builder's risk policy] did not cover the same loss because until the keys are turned over, as [Accola] has said, it is not their home."

¶82 In sum, the Chubb policy could not cover the damage to the house's structure because the Accolas' lacked the requisite interest in it. If the Chubb policy could not cover damage to the house's structure, it could not constitute "permanent property insurance [that] applies" to the covered property. Thus, the provision in the builder's risk policy terminating its coverage when "permanent property insurance applies," did not

4

take effect and the builder's risk insurance was in effect when the fire damaged the house.

¶83  For the reasons set forth above, I concur.

¶84  I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

¶85 REBECCA G. BRADLEY, J. *(concurring in part, dissenting in part).* I agree that interpretation of the insurance policies at issue presents a question of law for this court to decide; therefore, I join Part III of the majority opinion. I respectfully dissent from Part IV of the majority opinion because the homeowner's policy in effect on the date of the loss constituted "permanent property insurance that applies" as that phrase is unambiguously used in the builder's risk policy. Therefore, coverage under the builder's risk policy ended when the homeowner's policy took effect.

¶86 This case involves two separate insurance policies: (1) a builder's risk policy issued by Assurance Company of America to Fontana Builders, Inc. and (2) a homeowner's policy issued by Chubb Insurance Company to James and Suzy Accola. As the majority explains, interpretation of insurance policies presents a question of law for the court to decide. Majority op., ¶38. The majority also correctly explains that "whether the [builder's risk] policy provides an initial grant of coverage turns upon whether 'permanent property insurance applie[d]' so as to terminate coverage." Id., ¶51. To answer this question, I focus on the terms of the policies, interpret them as a reasonable person in the position of the insured would, and resolve any ambiguities in favor of coverage for the insured. See Burgraff v. Menard, Inc., 2016 WI 11, ¶¶21-22, 367 Wis. 2d 50, 875 N.W.2d 596.

¶87 The builder's risk policy in effect at the time of loss took effect on April 19, 2007, although construction of the

1

home began in 2005 and Assurance issued an earlier insurance policy that year. Although the new policy listed a one-year effective period, Section E.3 provides additional conditions governing both the beginning and the end of coverage. At issue is Section E.3.f. in the builder's risk policy, which provides:

> E. Additional Conditions
>
> The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:
>
> . . .
>
> 3. When Coverage Begins and Ends
>
> We will cover risk of <u>loss</u> from the time when you are legally responsible for the Covered Property on or after the effective date of this policy if all other conditions are met. <u>Coverage will end at the earliest of the following</u>:
>
> . . .
>
> f. <u>When permanent property insurance applies</u> . . .

(second and third emphasis added). As the majority indicates, the builder's risk policy does not define "permanent property insurance" nor does it define "applies." Majority op., ¶52. This is not problematic, however, because the meaning of the phrase "when permanent property insurance applies" is unambiguous.

¶88 The first question is whether homeowner's insurance may be considered "permanent property insurance" under the builder's risk policy. A reasonable person purchasing insurance would understand that a homeowner's insurance policy constitutes "permanent property insurance." It is unnecessary to

2

specifically define the boundaries of "permanent property insurance" because homeowner's insurance reasonably falls within those boundaries.

¶89 The second question is the meaning of "applies" as that word is used in section E.3.f. of the builder's risk policy. The majority opinion questions the clarity of "applies," majority op., ¶54, and ultimately concludes that "[t]he Chubb [homeowner's] policy in no way covered Fontana's interest as a builder and owner; therefore, it did not 'apply' so as to supersede the builder's risk coverage." Majority op., ¶64. I disagree. The meaning of "applies" is not ambiguous and does not depend upon an analysis of Fontana's interests.

¶90 Section E.3. governs the beginning and end of coverage under the builder's risk policy for the "Covered Property." It logically follows that the word "applies" within the phrase "[w]hen permanent property insurance applies" refers to the application of "permanent property insurance" to the property covered by the policy. The builder's risk policy lists the location of the property: 1527 Muirfield Court in Lake Geneva, Wisconsin. It also defines "Covered Property," in pertinent part, as:

> Property which has been installed, or is to be installed in any commercial structure and/or any single family dwelling, private garage, or other structures that will be used to service the single family dwelling at the location which you have reported to us. This includes:
>
> (1) Your property;
>
>  . . . .

3

Under this definition, a reasonable insured would understand that the covered property is the home located at 1527 Muirfield Court.

¶91 The majority concludes that the meaning of "applies" in the phrase "[w]hen permanent property insurance applies" is ambiguous because it could be interpreted to mean: (1) permanent property insurance acquired by the builder after completion of the structure or (2) permanent property insurance acquired by any third party, such as a prospective buyer, to cover the property. See majority op., ¶55. Merely because "permanent property insurance" could be procured by more than one type of insured does not render "applies" a term without an ascertainable meaning. The insurance policy does not condition the end of coverage on the insured (here, the builder) obtaining the permanent property insurance. Instead, permanent property insurance could be obtained by the builder at the completion of construction or by another interested party, such as the owner or prospective owner. Under the unambiguous language of the builder's risk policy, the procurement of permanent property insurance covering the property ends coverage under the builder's risk policy. The condition in the builder's risk policy ends coverage "when other permanent property insurance applies"——regardless of whether it is the insured under the builder's risk policy that obtains the permanent property insurance.

¶92 The final question is whether the homeowner's policy (the permanent property insurance) applied to the home (the

4

covered property) at the time of the loss. The answer is yes. The homeowner's policy insured the home located at 1527 Muirfield Court in Lake Geneva, Wisconsin, which is the same home insured under the builder's risk policy. As a result, coverage under the builder's risk policy ended when the homeowner's insurance took effect on June 21, 2007, prior to the loss.

¶93 This interpretation is not only consistent with how a reasonable insured would read the builder's risk policy language, but also comports with the purpose of builder's risk insurance. "A builders risk policy typically covers a structure under construction; materials, fixtures, supplies, machinery, and equipment to be used in the construction . . . ." 5 Jeffrey E. Thomas & Susan Randall, New Appleman on Insurance Law Library Edition § 50.01(1)(a) (2015). This is exactly how Barbara R. Holden, the supervisor of builder's risk insurance underwriting at Assurance, explained Assurance builder's risk policies during her deposition in this case. She testified that builder's risk insurance covers "structures under construction, renovations, or additions" along with "materials that will be installed by the builder." Furthermore, a builder's risk policy is a temporary form of insurance that "ends once the construction is considered completed, as defined in the policy. It is then up to the owner to obtain permanent property insurance on the newly constructed property." Id. Builder's risk "coverage generally extends until the placement of permanent property insurance to cover the

5

completed work." 4 Douglas L. Patin, Law and Prac. of Ins. Coverage Litig. § 45:25 (2015).

¶94 That is precisely what happened here. Assurance issued the builder's risk policy to Fontana Builders and AnchorBank on April 19, 2007. That policy terminated when the prospective owners, the Accolas, obtained permanent property insurance on June 21, 2007 in the form of a homeowner's policy from Chubb Insurance Company. Although the Accolas had not yet closed on the home prior to the loss, construction was essentially completed as evidenced by the fact that the Accolas were living in the home and had moved over $500,000 worth of personal property into the home. These actions, along with the fact that they paid nearly $5,000 to obtain the homeowner's policy, indicate that the Accolas had every intention of completing the purchase of the home.

¶95 Notably, as the majority opinion acknowledges, because a significant percentage of the home's construction was already completed at the time Fontana applied for a new builder's risk policy, Assurance would have declined to issue another builder's risk policy to Fontana, but for Assurance's data entry error during the underwriting process. See majority op., ¶11 n.5. A builder's risk policy is designed to cover a structure under construction. It is not intended to insure a home occupied by a family and $500,000 worth of that family's personal property.

¶96 The majority opinion raises the specter of "substantial mischief" in the construction industry if prospective purchasers could terminate a builder's risk policy.

6

Majority op., ¶66. The majority opinion, however, ignores the fact that an insurance policy is a contract and a builder may negotiate and pay premiums for the risks the builder wishes to insure. In this case, Fontana purchased a policy containing a number of conditions under which coverage would end, including not only "[w]hen permanent property insurance applies" but also "[n]inety days after initial occupancy of the Covered Property" among others. To hold, as the majority does, that Fontana purchased a policy intending to maintain coverage overlapping with coverage obtained by the family occupying the home rewrites the Assurance policy and confers a benefit on Fontana for which it did not bargain.

¶97 The majority opinion acknowledges that James Accola was the president and sole shareholder of Fontana,[1] yet repeatedly insists Fontana had a reasonable expectation that coverage would persist under the builder's risk policy,[2] despite the Accolas' procurement of the homeowner's policy concomitantly with their occupancy of the home. The fact that the Accolas obtained coverage for the home under a homeowner's policy suggests exactly the opposite reasonable expectation on the part of Fontana—that the homeowner's policy would supplant the builder's risk policy because construction was substantially complete to the extent that the Accolas and over $500,000 of their property could occupy the home. These unique facts belie

---

[1] Majority op., ¶3.

[2] See majority op., ¶¶5, 58 n.14, 67.

7

any purported frustration of Fontana's reasonable expectations. That the homeowner's policy would succeed and not overlap with the builder's risk policy is indeed the only reasonable expectation Fontana could have had, unless it (or the Accolas) intended a different sort of "substantial mischief."

¶98 The majority's conclusion results in a "remand to the circuit court for a determination of Fontana and AnchorBank's remaining damages." Majority op., ¶69. This instruction could be read as an invitation to disregard the principle that "[t]here can be but one recovery" with respect to a loss. See Ben-Hur Mfg. Co. v. Firemen's Ins. Co. of N.J., 18 Wis. 2d 259, 266, 118 N.W.2d 159 (1962). Stated differently, the majority's opinion could be read as allowing two recoveries for the same loss——namely damage to the home on Muirfield Court. This is precisely what our decision in Ben-Hur prohibited. Id.

¶99 In Ben-Hur, a fire damaged property manufactured by Ben-Hur Manufacturing Company that it housed in its distributor's warehouse. Id. at 260. Ben-Hur had a policy with American Church & Home Mutual Insurance Company while Firemen's Insurance Company of New Jersey insured the distributor. Id. The question arose as to whether one or both policies covered the fire loss. The answer turned on whether Ben-Hur, the distributor, or both parties had an insurable interest in the damaged property. Id. at 263, 265-66. We held that both Ben-Hur and the distributor had different insurable interests in the damaged property. Id. at 265. Despite each party having its own insurable interest in the same property, we explained: "This

8

does not mean, of course, that both could have collected the full damage to the goods nor are they attempting to do so." Id. at 266. This principle applies here.

¶100 The majority concludes the homeowner's policy did not "apply" to terminate the builder's risk policy "because Fontana and the Accolas insured different interests in the property." Majority op., ¶5. As explained in Ben-Hur, the existence of separate insurable interests does not mean Fontana is entitled to indemnity under its builder's risk policy because the homeowner's insurer already paid for a substantial amount, if not all, of the damage to the home. While Fontana had a separate insurable interest, on remand, Fontana cannot recover damages for a loss that has already been fully covered under the homeowner's policy procured by the Accolas.

¶101 Unfortunately, the majority creates dangerous precedent by rewriting an insurance policy, ostensibly to protect a builder from losing coverage for the property before title passes to another. The insurance policy for which Fontana bargained did not provide for such coverage and therefore the majority confers a benefit on Fontana for which Assurance has not been paid. As a result, Fontana could receive a windfall payment from Assurance for a loss it did not suffer because the risk of that loss had already passed to another party; the Accolas have already been paid for the damage to the property despite their status as occupiers rather than owners at the time of the loss. The unique facts of this case are unlikely to arise again unless a similar error in the underwriting process

9

results in the issuance of a builder's risk policy when construction is already substantially completed. Nevertheless, the majority opinion incentivizes "substantial mischief" in the construction industry of a different sort than it fears by permitting a double recovery for but one loss.

¶102 In sum, I agree with the majority that interpretation of the insurance policies at issue presents a question of law for this court to decide; therefore, I join Part III of the majority opinion. I do not agree with the majority's interpretation of the builder's risk policy; therefore, I respectfully dissent from Part IV of the majority opinion. Under the unambiguous terms of the builder's risk policy, the homeowner's policy in effect on the date of the loss constituted "permanent property insurance that applies." Coverage under the builder's risk policy ended when coverage under the homeowner's policy took effect.

10