PER CURIAM.
¶1 This is a contract dispute involving, on one side, a sales representative, Tamareed Company, and on the other, two manufacturers, The Gage Corporation, Int., and Mid-City Steel, Inc. Tamareed contends that Gage/Mid-City owes Tamareed approximately $1.2 million as a commission payment.[1] This contention is based on Tamareed's position that it fulfilled its contractual obligation to assist Gage/Mid-City in securing a contract to sell an architectural feature for a building project in Saudi Arabia. After the Saudi building project deal collapsed, Gage/Mid-City refused to pay Tamareed the $1.2 million commission it sought. This litigation followed.
¶2 Addressing summary judgment motions, the circuit court determined that Tamareed and Gage/Mid-City formed a contract through a series of letters and email messages. The court also determined, however, that this contract was ambiguous on the issue of what circumstances would trigger Tamareed's entitlement to a commission, creating a jury issue. At trial, a jury found in Gage/Mid-City's favor that Tamareed was not entitled to a commission. Based on those verdicts, the jury did not reach questions about the amount of commission owed or the potential for exemplary damages.
¶3 On appeal, Tamareed argues that the circuit court: (1) erred in concluding that the contract between Tamareed and Gage/Mid-City was ambiguous on the issue of what would entitle Tamareed to a commission because, according to Tamareed, case law resolves the ambiguity; (2) erred in dismissing Tamareed's claim for unjust enrichment on the court's stated ground that, if a contract covers the subject of an unjust enrichment claim, an allegedly aggrieved party cannot pursue both an unjust enrichment claim and a breach of contract claim; and (3) erroneously exercised its discretion in allowing certain expert testimony at trial and instructing the jury that it could consider the expert testimony. We reject each of Tamareed's arguments and, accordingly, affirm.[2]
BACKGROUND
¶4 We supplement the following summary of undisputed facts as necessary in the discussion section below. Tamareed markets and sells architectural products and services in Saudi Arabia on behalf of non-Saudi manufacturers. Sparta-based Gage and La Crosse-based Mid-City are both manufacturers.
¶5 Tamareed became aware of plans for a construction project in Saudi Arabia and worked to secure a related construction contract for Gage/Mid-City. Specifically, Gage/Mid-City was to design and produce exterior building coverings or panels (called cladding), to be installed by a Saudi contractor. Tamareed acted as a sales representative and consultant for Gage/Mid-City. In defining their contractual relationship, Tamareed and Gage/Mid-City did not enter into a formal, single-document commission agreement. Instead the parties exchanged a series of letters and emails between February 2009 and January 2012 addressing aspects of the project and their respective obligations.
¶6 As to the Saudi project itself, Gage/Mid-City struck an agreement with a Saudi building contractor, under which Gage/Mid-City would design and supply cladding, at a price exceeding $20 million. The parties call this the "supply agreement." At some point after Gage/Mid-City entered into the supply agreement, Gage/Mid-City discovered that the building contractor who was supposed to purchase and install the cladding had stolen Mid-City Steel's design and was producing "counterfeit" cladding. Gage/Mid-City commenced litigation against the building contractor in Saudi Arabia.
¶7 Gage/Mid-City and the Saudi building contractor subsequently mediated and settled their dispute for just over $3 million. Gage/Mid-City offered Tamareed a commission of approximately $65,000 out of the settlement proceeds. Tamareed rejected the offer.
¶8 Gage/Mid-City sued for a declaratory judgment in the Monroe County Circuit Court. Specifically, Gage/Mid-City asked the court to declare that Gage/Mid-City owed Tamareed no commission because the deal embodied by the supply agreement had fallen through. Tamareed counter-claimed, seeking what it refers to as its "full contract commission of $1,172,000.00." The parties filed cross motions for summary judgment.
¶9 The court determined that the parties' communications had formed a contract, but that this contract was ambiguous regarding how Tamareed would become entitled to a commission. The matter was tried to a jury, which found that Tamareed was not entitled to a commission at either of two specified times, the only times at issue: when Gage/Mid-City entered into the supply agreement, and when Gage/Mid-City received the settlement from the Saudi building contractor. The court entered judgment on the verdict, and denied Tamareed's post-verdict motions. Tamareed appeals.
DISCUSSION
I. INTERPRETATION OF FOSTER
¶10 Tamareed makes an argument that rests entirely on its interpretation of Foster v. Holbrook-Armstrong Iron Co. , 158 Wis. 447, 149 N.W. 148 (1914), to the effect that Foster resolves the issue of whether Tamareed was entitled to a commission. We reject this argument for reasons we now explain.
¶11 The parties do not dispute any aspect of the following propositions. "A contract provision is ambiguous if it is fairly susceptible of more than one construction. When a contract provision is ambiguous, and therefore must be construed by the use of extrinsic evidence, the question is one of contract interpretation for the jury." Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co. , 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996) (citations omitted); Fontana Builders, Inc. v. Assurance Co. of Am. , 2016 WI 52, ¶¶ 42-48, 369 Wis. 2d 495, 882 N.W.2d 398 (interpretation of contract is a question for the jury when necessary to resolve factual disputes, as illuminated by extrinsic evidence, about the parties' understandings at the time they entered into the contract). The circuit court here applied these principles in a series of related rulings made before, during, and after trial. The court determined that 2009-2012 exchanges of letters and emails between Tamareed and Gage/Mid-City formed a contract, but that the contract was ambiguous in defining the circumstances under which Tamareed would become entitled to a commission payment. For those reasons, the court determined, the jury needed to hear evidence and make findings regarding the parties' understandings at the time the contract was formed.
¶12 Tamareed argues that there was no need for a jury trial. Tamareed submits that Foster stands for a rule that renders irrelevant any ambiguity in the Tamareed-Gage/Mid-City contract on the topic of whether Tamareed became entitled to a commission. We now summarize Foster , further summarize Tamareed's Foster -based argument, and explain why we conclude that Foster does not support Tamareed.
¶13 The plaintiff in Foster fulfilled contractual obligations to the defendant that included securing a contract for the defendant to sell engines to a third party. Foster , 158 Wis. at 448-50. The third party failed to perform on its obligation to buy the engines from the defendant. Id. As a result, the defendant refused to pay the commission to the plaintiff. Id. The Foster court decided that, based on the terms of the contract between the plaintiff and defendant, the plaintiff was entitled to recover the commission stipulated in the contract. Id. at 451.
¶14 Tamareed interprets Foster to stand for a blanket rule that favors commissioned sales agents. Tamareed's interpretation would apply whenever there is a contract between buyer (here, the Saudi contractor) and a seller (Gage/Mid-City) that was procured by a seller's agent (Tamareed), regardless of whether the goods are delivered to the buyer or whether the buyer pays for the goods. In that situation, the blanket rule would entitle the seller's agent to its commission if the buyer breaches its contractual obligation to buy, and the seller accepts payment in settlement from the buyer for any violation of seller's rights unrelated to the commission agreement. Based on this rule, Tamareed argues, "it simply doesn't matter whether the contract was ambiguous" on the topic of the circumstances in which Tamareed became entitled to a commission.
¶15 Foster does not stand for any such blanket rule. Instead, the court plainly based its decisions on constructions of the specific contract at issue in Foster , and the facts in Foster diverge in significant ways from the facts here. See Foster , 158 Wis. at 448-51. The contract in Foster unambiguously established the circumstances that would trigger the plaintiff's entitlement to the stipulated commission: the plaintiff was to be paid a commission "in consideration for" specific obligations that the plaintiff undertook, regardless whether the goods were delivered by the seller or the buyer paid in full for the goods. Id. at 448, 450. In contrast, here the parties exchanged many statements in forming their agreement, including statements that could support a determination that Tamareed's commission was to be triggered only by Gage/Mid-City receiving payment for goods sold.[3] There is no dispute that Gage/Mid-City never received payment for goods sold.
¶16 As the Foster court explained, the seller in Foster settled with the breaching buyer after the seller knew that it had incurred liability for the commission to the sales representative. See Foster , 158 Wis. at 451 ("And settlement having been made with full knowledge on the part of the [seller] of its liability to [the sales representative] under its contract with them, the presumption arises that it considered the $20,000 sufficient to discharge such liability, as well as to reimburse it for its own loss."). Here, in contrast, the contract language was ambiguous as to whether Gage/Mid-City had incurred liability to Tamareed before settling its dispute with the breaching Saudi buyer.
¶17 Tamareed attempts to save its Foster -based argument by pointing to the "procuring cause doctrine." This doctrine amounts to a default rule that a selling agent generally " 'earns his commission when he procures an order from a ready, willing and able purchaser and this order is received by the company.' " See Kreinz v. NDII Securities Corp. , 138 Wis. 2d 204, 210, 406 N.W.2d 164 (Ct. App. 1987) (quoting Zweck v. DP Way Corp. , 70 Wis. 2d 426, 430-31, 234 N.W.2d 921 (1975) ). However, Tamareed fails to show that the "procuring cause doctrine" trumps a different intent expressed by contracting parties. Specifically, Tamareed does not develop an argument to refute Gage/Mid-City's well-supported argument that parties can contract to specify different circumstances under which a commission becomes due. See Nicoud v. Boley , 211 Wis. 431, 434, 248 N.W. 452 (1933) ("This agreement contains such definite wording as, that the commission is 'to be paid on the day the conveyances are executed.' This provision takes the case out from under the rule that the real estate agent is entitled to be paid a commission when he finds a purchaser able, willing, and ready to buy the property at the price fixed by the owner, and places it under the rule that the seller and the real estate agent having stipulated the conditions upon which the payment of the commission depends, a recovery is limited by those stipulations.") (quoted source omitted); see also Ash Park, LLC v. Alexander & Bishop, Ltd. , 2015 WI 65, ¶¶ 85-88, 363 Wis. 2d 699, 866 N.W.2d 679 (where listing contract did not condition payment of broker's commission on final consummation of transaction, broker entitled to its commission despite buyer's default).
¶18 Tamareed also makes a brief assertion that we have difficulty tracking as an argument. Tamareed asserts that Gage/Mid-City's argument wrongly elevates the word "consideration," as used in the Foster contract, into the status of a "magic word," which the parties in this case had to use in their contract in order for Tamareed to prevail. Whatever Tamareed precisely intends to argue along these lines, it is sufficient to note that the court in Foster operated from the apparent view that the phrase in the contract in that case-" '[i]n consideration for your services and efforts in' " undertaking identified obligations-clearly rendered the defendants "liable to plaintiffs" upon the plaintiffs undertaking those obligations. See Foster , 158 Wis. at 448, 450.
¶19 Tamareed makes another argument, based on the similarity between a provision in the Foster contract and certain language exchanged by the parties here in forming their agreement. See id. at 448. The Foster contract language was: "The six per cent. commission to be paid to [the plaintiff-agent] on receipt of each and all payments to" the defendant-seller. The language exchanged by the parties here involved discussion about the commissions due Tamareed being "paid parallel to receipt of funds" by Mid-City. Based on this similar concept in both agreements, Tamareed contends that the result here should be the same as the result in Foster . However, we agree with Gage/Mid-City that the court in Foster viewed the phrase "to be paid to you on receipt of each and all payments to" the defendant-seller as addressing the topic of when an earned commission had to be paid, and not whether a commission had to be paid. As we have explained, the result in Foster rested on the "consideration" language, which established the circumstances that would trigger entitlement to the commission. See id . We agree with Gage/Mid-City that payment-on-receipt language was, as the Foster court put it, "immaterial" to resolution of the dispute in Foster . See id . at 450.
¶20 Tamareed does not offer any additional developed arguments on this issue that we can discern. Tamareed does not dispute that, if its Foster -related arguments fail, then a jury issue existed. Nor does Tamareed argue that extrinsic evidence could not be relevant to a jury determination, so long as a jury issue existed. For these reasons, we affirm the circuit court's rulings that the contract was ambiguous and that this created a jury issue.
II. UNJUST ENRICHMENT
¶21 Tamareed purports to challenge the circuit court's decision to dismiss its claim for unjust enrichment. The court applied the rule that, if a contract covers the subject of a claim, then an unjust enrichment claim cannot be pursued in addition to a breach of contract claim. See Continental Cas. Co. v. Wisconsin Patients Comp. Fund , 164 Wis. 2d 110, 118, 473 N.W.2d 584 (Ct. App. 1991) ("The doctrine of unjust enrichment does not apply where the parties have entered into a contract."). Based on this rule, the court dismissed the unjust enrichment claim because the subject of Tamareed's unjust enrichment claim was the same as the subject of the breach of contract claim by Tamareed against Gage/Mid-City. We reject Tamareed's purported challenge for the following reasons.
¶22 In its brief-in-chief, Tamareed argues, based on Schwigel v. Kohlmann , 2002 WI App 121, 254 Wis. 2d 830, 647 N.W.2d 362, that a party pursuing a breach of contract claim must be allowed to pursue "an alternative claim" of unjust enrichment, even if it cannot collect what would amount to double damages based on the alternative claims. However, as Gage/Mid-City Steel explains, Schwigel does not remotely stand for this proposition. The court in Schwigel concluded that it was reversible error for a circuit court to instruct a jury that the same measures of damages applied to unjust enrichment, breach of contract, and negligent misrepresentation claims. Id. , ¶¶ 11-13. The Schwigel opinion does not discuss whether the unjust enrichment and breach of contract claims at issue were brought in the alternative. Aside from its Schwigel -based argument, Tamareed fails to explain in its brief-in-chief why the rule stated in Continental Casualty Company does not resolve the issue.
¶23 Further, in its reply brief, Tamareed implicitly concedes that its Schwigel -based argument is wrong by omitting any counterargument to Gage/Mid-City's analysis of Schwigel . Instead, Tamareed offers only a new argument. Tamareed's new argument is that the scope of obligations at issue in its unjust enrichment claim differed from the scope of obligations at issue in its breach of contract claim. We typically ignore arguments raised for the first time in a reply brief, see Roy v. St. Lukes Med. Ctr. , 2007 WI App 218, ¶ 30 n.6, 305 Wis. 2d 658, 741 N.W.2d 256, and we see multiple reasons not to depart from the general rule here. For these reasons, we affirm the circuit court's dismissal of the unjust enrichment claim.
III. EXPERT TESTIMONY AND JURY INSTRUCTION
¶24 The circuit court permitted both sides to offer expert testimony on custom and usage, after determining that this testimony could assist the jury in resolving ambiguity in the contract between Tamareed and Gage/Mid-City, and gave the jury the standard jury instruction on how to consider expert testimony. Tamareed argues that both of these were erroneous exercises of discretion. We conclude that the circuit court did not erroneously exercise its discretion in allowing expertise on custom and usage, or in giving the standard expert witness instruction, in light of the particular submissions and arguments of the parties in the circuit court. We first summarize pertinent legal standards, provide additional background, and then explain the arguments of the parties and our analysis.
A. Legal Standards and Relevant Law
1. WISCONSIN STAT . § 907.02(1)
¶25 Admissibility of expert testimony is governed by WIS. STAT . § 907.02, which provides in pertinent part:
Testimony by experts. (1) If ... specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.
WIS. STAT . § 907.02(1). This "adopt[s] the federal standard, which incorporates the analysis promulgated in Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579 (1993)." State v. Jones , 2018 WI 44, ¶ 7, 381 Wis. 2d 284, 911 N.W.2d 97.
¶26 Our supreme court has explained that, in applying the federal reliability standard, "hard and fast rules" do not apply, and "broad latitude" is due to trial court decisions:
How courts apply [the multiple] factors [listed in Daubert and by the Federal Rules Advisory Committee] necessarily varies case by case, expert by expert. "Too much depends upon the particular circumstances of the particular case at issue" to impose hard and fast rules. Kumho Tire [Co., Ltd. v. Carmichael ,] 526 U.S. [137] at 150, 119 S. Ct. 1167 [ (1999) ]. A trial court conducts its reliability analysis with wide latitude. Kumho Tire emphasized that the application of the Daubert factors is a flexible inquiry: "[T]he law grants a [trial] court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire , 526 U.S. at 142, 119 S. Ct. 1167.
Seifert v. Balink , 2017 WI 2, ¶ 64, 372 Wis. 2d 525, 888 N.W.2d 816 (footnote omitted).
2. Jury Instructions
¶27 "A circuit court has wide discretion in determining which jury instructions to give. If the given jury instructions adequately communicated the law and were applicable to the facts, no grounds for reversal exist." 260 North 12th Street, LLC v. DOT , 2011 WI 103, ¶ 66, 338 Wis. 2d 34, 808 N.W.2d 372 (citation omitted). Under the erroneous exercise of discretion standard, we affirm if the circuit court relied on facts of record, the applicable law, and used a demonstrable rational process to reach a reasonable decision. State v. Doss , 2008 WI 93, ¶ 19, 312 Wis. 2d 570, 754 N.W.2d 150.
3. Custom and Usage
¶28 Evidence of custom and usage has been discussed in the following terms:
"A uniform trade custom is readily accepted by courts to define what is ambiguous or is left indeterminate in a contract, where both parties have knowledge of the custom, or are so situated that such knowledge may be presumed, for the reason that the majority of such transactions are had in view of the custom, and the agreement on which the minds of the parties actually met will thereby be carried into effect. [ ] Where the custom is proved to be known to both, it may even add terms to the contract. [ ] Where the custom is general , it will be presumed to have entered into the contract, and one may be bound thereby, although ignorant, unless the other party be shown to have knowledge of his ignorance."
Ross v. Northrup, King & Co. , 156 Wis. 327, 337, 144 N.W. 1124 (1914) (quoting Gehl v. Milwaukee Produce Co. , 105 Wis. 573, 580, 81 N.W. 666 (1900) (italics in original) ).
B. Additional Background
¶29 The following is additional background on these topics.[4]
1. Pretrial Evidentiary Ruling Regarding Expert Testimony
¶30 Before trial, Gage/Mid-City proposed to call multiple witnesses at trial to testify regarding industry custom and usage, in support of its argument that Tamareed knew or should have known of an industry custom under which commissioned sales representatives typically earn sales commissions only after their principals receive payments on the contracts that the representatives helped secure.
¶31 Tamareed responded that the circuit court should preclude all such testimony, because "there is no evidence of any kind that Tamareed 'knew or should have known' of" a custom or usage to this effect "in the Saudi region[,] where Tamareed accepted and performed the [Gage/Mid-City] sales contract." Tamareed also argued that, if the court allowed any such evidence, it should permit its expert, Gary Thompson, to testify to rebut the expert testimony presented by Gage/Mid-City.
¶32 Gage/Mid-City replied that its experts would testify "that there is an industry custom that is consistent domestically [in the U.S.] and internationally," and in addition that one of its experts would "establish that Tamareed knew or should have know of this custom." Gage/Mid-City also objected to Thompson being allowed to testify on the ground that he had no relevant evidence to give.
¶33 At a pre-trial hearing, Tamareed argued that the expertise offered by Gage/Mid-City was not relevant, because of the nature of the relevant work history of Tamareed and its part owner and manager, Nasr Al Ozaibi, in the "architectural products industry." More specifically, Tamareed contended that, within the architectural products industry, Tamareed had always been a "reseller," and not a commissioned sales representative for suppliers. This mattered, Tamareed's argument proceeded, because resellers do not bargain for commissions, but instead make their money through direct purchases and sales. Based on that factual premise, Tamareed argued that there was no evidence that it had knowledge at pertinent times regarding the vocation of commissioned sales representative, including how they are typically compensated. As part of this approach, Tamareed sought to have Thompson testify that "there was no commissioned rep business in Saudi Arabia whatsoever."
¶34 At this hearing, Gage/Mid-City made points that included the following. Tamareed's Al Ozaibi had testified that he himself may have been an agent, not a reseller, in prior transactions, directly undercutting Tamareed's arguments. Further, Gage/Mid-City pointed to evidence that Al Ozaibi had acted as a reseller in "a dozen transactions" involving one of Gage/Mid-City's expert witnesses, Christopher Oliver, who had acted as a commissioned sales representative in Saudi Arabia. Gage/Mid-City argued that it should be able to present testimony regarding aspects of Al Ozaibi's work history to support the argument that he was not ignorant of what was allegedly common knowledge throughout the architectural products industry regarding when sales representative typically become entitled to commissions. Gage/Mid-City also argued that Thompson's testimony should be barred. Gage/Mid-City contended, in part, that it was not credible to think that Al Ozaibi/Tamareed, in helping to secure the supply agreement for Gage/Mid-City, acted as the first ever commissioned sales representative in the Kingdom of Saudi Arabia.
¶35 After considering extensive written submissions and argument, the circuit court determined that Gage/Mid-City had met the evidentiary "threshold" with testimony from Oliver, Al Ozaibi, and others, such that it would assist the jury and would not unfairly prejudice Tamareed. The court expressed a high degree of skepticism regarding a core argument of Tamareed's, namely, that because Al Ozaibi may have had a history of being exclusively a reseller by trade, and not a commissioned sales representative, he could not have gained knowledge about how commissioned sales representatives are compensated. The court suggested that this distinction was too "fine" a "line" to draw. In addition, the court denied Gage/Mid-City's request to bar Tamareed's expert, Thompson, from testifying, noting that both sides would be free to cross examine each other's experts, which would give the jury, once "properly instructed as to how industry custom applies," a reliable basis to resolve this issue.
2. Trial Testimony
¶36 Pertinent trial testimony included the following. Called by Gage/Mid-City, Steve Holeczy and Christopher Oliver testified to a custom in the architectural products industry that commissioned sales agents are not entitled to payment until the product at issue is delivered and the principal is paid for it. Oliver also testified that he discussed this custom directly with Al Ozaibi. Oliver testified that he was involved in at least four projects in Qatar or Saudi Arabia in which he was not paid unless product was delivered.
¶37 Called by Tamareed, Thompson testified that he was not aware of any such custom in Saudi Arabia, because he was not aware of any commissioned sales representatives operating in Saudi Arabia.
3. Ruling Regarding Expert Witness Instruction During Trial
¶38 At trial, Tamareed objected to the court giving WIS JI-CIVIL 260, in any form. This is a standard jury instruction, which reads as follows:
Usually, witnesses can testify only to facts they know.
But, a witness with expertise in a specialty may give an opinion in that specialty. In determining the weight to be given an opinion, you should consider the qualifications and credibility of the expert and whether reasons for the opinion are based on facts in the case. Opinion evidence was admitted in this case to help you reach a conclusion. You are not bound by any expert's opinion.
In resolving conflicts in expert testimony, weigh the different expert opinions against each other and consider the qualifications and credibility of the experts and the reasons and facts supporting their opinions.
Tamareed did not object to any particular instruction language. Instead it made the blanket objection that no such instruction should be given because no expert testimony should be admitted. Tamareed contended that the only testimony at trial was that "business is conducted very differently in the Kingdom of Saudi Arabia and the Middle East region generally," than it is elsewhere, and that the jury had heard insufficient evidence that sales representatives ever work on commission in Saudi Arabia. In response, Gage/Mid-City pointed to "testimony that Mr. Al-Ozaibi, in fact, acted as a commissioned sales rep in one entire transaction with Mr. Oliver, and Mr. Oliver testified generally that that was always the structure that he always used."
¶39 The circuit court overruled the objection to the instruction. The court noted that the jury had had opportunities to hear from multiple persons with relevant work experience regarding customs in the architectural products industry regarding how compensation is handled. The court acknowledged testimony that, as the court put it, "Saudi Arabia deals with things a little bit differently," but stated that it considered this to involve a difference of opinion that the jury could sort out based on the evidence and the relative strengths of the parties' arguments.
C. Party Arguments And Analysis
¶40 Tamareed offers several variations on its argument that the circuit court erroneously exercised its discretion in allowing expert testimony and instructing the jury in how to weigh the expert testimony. Tamareed argues that the court failed to give sufficient weight to the relevant location of industry custom (which Tamareed submits had to be strictly limited to business activity in Saudi Arabia), to the relevant vocation (which Tamareed submits had to be strictly limited to activities of commissioned sales representatives), and to facts that Tamareed submits made the transaction embodied in the supply agreement unusual in various respects. However, we agree with Gage/Mid-City that these variations share the common flaw of confusing "the role of the circuit court as gatekeeper under [ WIS. STAT . §] 907.02 [with] the role of the jury as the fact finder to determine what the industry custom was and whether Mr. Al Ozaibi knew or should have known of it."
¶41 As gatekeeper, the circuit court was required to determine that the testimony would be "the product of reliable principles and methods," and that "the witness has applied the principles and methods reliably to the facts of the case." See WIS. STAT . § 907.02(1). However, it was not the court's duty to weigh the relative strength of conflicting inferences raised by conflicting expert testimony. That is, the Daubert standard does not involve evaluation of which inferences can be most persuasively drawn from the testimony, but rather requires a court to admit or exclude evidence based on its reliability and relevance. See Daubert , 509 U.S. at 587-90 (evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' ") (quoting FED. R. EVID . 401 ). "The court is to focus on the principles and methodology the expert relies upon, not on the conclusion generated." State v. Giese , 2014 WI App 92, ¶ 18, 356 Wis. 2d 796, 854 N.W.2d 687 (citing Daubert , 509 U.S. at 595 ).
¶42 This case involves a contract dispute in which Tamareed's understanding about a way of doing business might illuminate the meaning of an ambiguous contract term, an understanding that was of consequence to determining one term in Tamareed and Gage/Mid-City's contract. The testimony of Oliver in particular was admissible because it had a tendency to make the existence of Tamareed's knowledge of a relevant usage or custom more or less probable.
¶43 Tamareed fails to come to grips with the fact that much of the challenged testimony was admissible to show Al Ozaibi's actual knowledge of the existence of a custom or usage, given the business world in which Al Ozaibi apparently circulated. This is an independent basis on which the circuit court's decisions may be sustained because it is outside the realm of expert testimony. As noted,
"[a] uniform trade custom is readily accepted by courts to define what is ambiguous or is left indeterminate in a contract, where both parties have knowledge of the custom , or are so situated that such knowledge may be presumed, for the reason that the majority of such transactions are had in view of the custom, and the agreement on which the minds of the parties actually met will thereby be carried into effect."
See Ross , 156 Wis. at 337 (quoting Gehl , 105 Wis. at 580 ) (emphasis added). " 'Where the custom is proved to be known to both , it may even add terms to the contract.' " Id. (emphasis added, again quoting Gehl ).
¶44 Tamareed argues that the testimony of Holeczy and Oliver was "baseless," but fails to support this contention. As our limited summaries of the background above readily reveal, Gage/Mid-City's experts testified based on their work experiences, which provided a sufficient basis for the circuit court to find their testimony reliable. Tamareed's arguments to the contrary amount to cross examination or rebuttal material. Tamareed's position is effectively that the jury should have accepted its arguments that Saudi Arabia is, as Tamareed now puts it, "a unique location" for purposes of this case, and that Tamareed had no prior familiarity with sales commissions. Tamareed had the opportunity to convince the jury of these things and failed to do so.
¶45 In sum, under WIS. STAT . § 07.02(1), so long as the purported experiences of the experts appeared relevant and reliable, the decision to admit their opinions rested in the discretion of the circuit court. Applying the "broad latitude" standard of review, we conclude that the circuit court made a reasoned decision and properly applied the terms of § 07.02(1).[5]
¶46 Tamareed cites authority that is generally off point. For example, Tamareed places heavy emphasis on Lemke v. Hage , 142 Wis. 178, 125 N.W. 440 (1910). In Lemke , our supreme court held that "[p]roof of a particular custom or usage must be positive, clear, and satisfactory" and cannot rest solely on a witness testifying that he or she follows a practice in his or her own business. Id. at 181. In addition to other distinguishable facts in Lemke , the expert witnesses here did not testify solely to their own personal business experiences, but also to industry-wide practices, and, to a degree, direct communications with Al Ozaibi.
¶47 Another example of Tamareed's failure to cite case law that undermines the discretionary circuit court decisions that Tamareed challenges is its reliance on Thurner Heat Treating Co. v. Memco, Inc. , 252 Wis. 16, 30 N.W.2d 228 (1947). Thurner states that a fact finder may imply custom or usage within an industry as a term of a contract only if evidence of the custom or usage is " 'so well settled, so uniformly acted upon, and of so long a continuance, as to raise a fair presumption that it was known to both contracting parties, and that they contracted in reference to it and in conformity with it.' " Id. at 21 (quoting Lamb v. Klaus , 30 Wis. 94, 97 (1872) ). Tamareed fails to persuade us that the circuit court's evidentiary and instruction decisions run afoul of this legal standard. For purposes of analyzing this argument, we assume without deciding that this Thurner standard applies in the context of considering a motion to preclude expert testimony on the facts as presented to the circuit court here. Even under this assumed application of Thurner , Tamareed fails to establish that the circuit court lacked a sufficient basis to reasonably conclude that the expert testimony offered by both sides gave the jury a reliable basis to find that there was custom or usage "so well settled, so uniformly acted upon, and of so long a continuance, as to raise a fair presumption that it was known to both contracting parties, and that they contracted in reference to it and in conformity with it." Id.
CONCLUSION
¶48 For all of these reasons, we affirm the circuit court's ruling that the contract between Tamareed and Gage/Mid-City was ambiguous on the issue of what circumstances would trigger Tamareed's entitlement to a commission, its dismissal of Tamareed's claim for unjust enrichment, its exercise of discretion in allowing expert testimony at trial and instructing the jury regarding expert testimony, and its rulings regarding jury instructions on damages.
By the Court .-Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

We follow the circuit court and the parties in generally treating Gage and Mid-City as a single unit, which we call Gage/Mid-City, to reflect joint actions or shared or overlapping liabilities.

Tamareed also challenges a damages jury instruction, but we need not address this issue given how we resolve other issues on appeal.

Tamareed does not seriously dispute that such evidence was available. We provide an illustrative example. In a letter dated February 23, 2009, addressed to Tamareed's part owner and manager, the president of Gage "confirm[ed] our agreement," an agreement that included the following: "Tamareed mark-up of 5% to be treated as a 4.53% commission of the total selling price and to be paid as a 3.53 percentage of each payment received and recorded into The Gage Corporation account with the balance of 1% paid upon project completion." (Emphasis added.)

Tamareed fails to include in its statement of the case all pertinent procedural and substantive background facts regarding the expert testimony and instruction topics, and also fails to include adequate pertinent background in its argument sections. Instead, it merely scatters selective facts through its arguments. Largely missing from Tamareed's briefing are pertinent facts about what was testified to at trial that could matter to any argument that Tamareed makes. Similarly, it omits what the parties argued to the circuit court before it made the discretionary decisions that Tamareed now challenges.
For these reasons, we could reject Tamareed's arguments on the expert topics. See State v. Jackson , 229 Wis. 2d 328, 337, 600 N.W.2d 39 (Ct. App. 1999) (parties must present viable, fact-supported legal theories); Tam v. Luk , 154 Wis. 2d 282, 292, 453 N.W.2d 158 (Ct. App. 1990) (argument unsupported for lack of record citations); State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (undeveloped legal arguments generally disregarded).
However, we elect to address Tamareed's arguments as best we understand them, with assistance from the record and Gage/Mid-City's briefing, while deeming undeveloped any argument that Tamareed intends to make on the expertise and jury instruction topics that we do not address. This includes oblique references to circuit court decisions apart from the decisions to admit expert testimony and to give the expert witness jury instruction.

While not necessary to our resolution of this issue and not argued by the parties, we briefly observe that Tamareed's argument appears to be additionally undermined by language in Wis. Stat . § 34.93. That statute addresses payment of commissions to independent sales representatives and formed a basis for Tamareed's counterclaims. The statute sets forth a process for determining when commissions are due. Sec. 134.93(2). It states in pertinent part: "If it cannot be determined [from the contract between principal and representative] or [from past practice used by the principal and representative] when a commission becomes due, commission becomes due according to the custom and usage prevalent in this state for the particular industry of the principal and independent sales representative." Sec. 134.93(2)(c) (emphasis added).